## 37629. WATERS v. THE STATE.

GREGORY, Justice.

Appellant, Eurus Kelly Waters, was indicted May 13, 1980 for the murders of Anita Lynette Paseur and Kathryn Ann Culpepper. He was found guilty of both murders and sentenced to death. Waters' defense was insanity; the evidence is undisputed that Waters killed Ms. Paseur and Ms. Culpepper.

At 4:33 p.m. on Friday, April 25, 1980, EMT's (Emergency Medical Technicians) with the Jekyll Island Fire Department received a call reporting a shooting at a Phillips 66 station on Jekyll Island. When they arrived at the station, Kathryn Culpepper was sitting in a red AMC Gremlin automobile. She had a gunshot entry wound in her chest and an exit wound in the area of her left kidney. A pair of handcuffs was fastened to her left wrist. As she was being placed into the ambulance, she asked one of the EMT's to get her purse out of the car; however, he was unable to locate it.

A state trooper who had also responded to the call asked Ms. Culpepper what had happened. She told him that while she and a girlfriend had been fishing, a white male had pulled a gun on them, made them march into the woods, handcuffed them, sexually assaulted her, and then shot both of them. She thought the other woman was dead.

The body of the other woman, Anita Paseur, was found approximately two miles south of the Phillips 66 station in what is known as the New Marina area of Jekyll Island. She was lying on her back, clothed from the waist up, with her bathing suit bottom and shorts pulled down to her ankles. She had a bullet wound in the upper left part of her chest. A later autopsy showed that Ms. Paseur's death resulted from the gunshot wound. A .38 caliber bullet was removed from her during the autopsy. A GBI agent, using a metal detector at the crime scene, found another .38 caliber bullet under some leaves about 10 feet from where Ms. Paseur had been found.

GBI agent Scott Curley talked to Ms. Culpepper in the hospital. He obtained a description of the killer, his car, his gun and holster, and Ms. Culpepper's missing pocketbook. Agent Curley then posted a lookout for a white male in his late thirties, of average height, with light brown hair and light blue eyes, having a country accent, and wearing a light blue shirt, dark blue pants and black shoes; for an older model white, 4-door Pontiac or Buick automobile with a Georgia tag; for a .38 or .357 police-type revolver; for a black leather holster; and for a burgundy colored, John Romain shoulder bag containing personal items belonging to Kathryn Culpepper.

Kathryn Culpepper died April 30. The cause of her death was

excessive fluid around the heart and the pericardium, caused by the trauma directly beneath her heart, in the liver and pancreas, which in turn was caused by the bullet wound.

Eurus Kelly Waters was a cab driver in Waycross. He worked half a day Wednesday, April 23 and Thursday, April 24. He did not work at all on Friday.

Dorothy Googe was lying by herself on the beach at Jekyll Island early Friday afternoon. A fully dressed man, wearing long, dark pants, a blue shirt, and black shoes, walked by her toward the picnic area. He returned twice during the next few minutes to show her some shells he had collected. The second time, Ms. Googe told him she didn't want any company. When he approached her a third time, she told him she had to go down to where her husband and son were and she left. The man spoke with a country accent. Ms. Googe later identified Waters, by means of a photographic lineup, as the man on the beach.

Between 4:30 and 5:00 p.m. Friday, Brantley County Deputy Sheriff Jerry Rowell was travelling west on Highway 84. As he came over the top of the Satilla River Bridge, he had to slow down to 20 miles per hour behind a white 4-door 1974 Chevrolet. After following the car for a while, Deputy Rowell, suspecting the driver was intoxicated, stopped the car. When the driver opened his door, Rowell saw a Motorola police-type radio on the transmission hump and asked the driver if he worked for a timber company. The driver told him no, he was a part-time cab driver in Waycross. Deputy Rowell decided the driver was not intoxicated and let him proceed. He later identified Waters, by means of a photographic lineup, as the driver of the car.

On the afternoon of Thursday, May 1, 1980, Ms. Culpepper's burgundy colored, John Romain shoulder bag, containing various credit cards but no cash, was found on the west bank of the Satilla River just under the Satilla River Bridge.[1] The Satilla River Bridge is 33.2 miles from the New Marina area of Jekyll Island.

Waters told his wife, Helen, when he got home the evening of the 25th that he was late because he had got stuck in the swamp. He went back to work Saturday. Next Tuesday, April 29, Helen Waters read an article in the paper about the murders on Jekyll Island. The article gave a description of the suspect. She turned to her husband and said,

---

[1] Ms. Culpepper's driver's license was found first. The purse was found a few minutes later. In it were Sears, Visa, Phillips 66, J. C. Penney, Texaco, Belk's and Mr. B's Honeytree credit cards, all bearing the name Kathryn Ann Culpepper or Mrs. Richard B. Culpepper.

"Kelly, this murder, these things that's happened on Jekyll Island, this description fits you." Waters looked at her for a few seconds and then said, "call Judy." When Judy Petty, Waters' sister, arrived, Waters started crying and said, "Sister, I think I may have killed some people. If I have done this thing, I want to die." He continued crying for most of the rest of the evening. Ms. Waters got her husband's gun, which was fully loaded, out of the bedroom dresser, and hid it under the sink. A few minutes later, another of Waters' sisters, Georgia Rainey, and her husband arrived. Mr. Rainey got the gun out and smelled it to see if it had been fired. He couldn't smell anything. He unloaded the gun and Ms. Waters hid the bullets under the television and put the gun back under the sink. After some discussion, the family decided not to call the police at that time; Ms. Petty would try to get in touch with a friend of hers, Ed Dixon, a Glynn County policeman, and ask him what to do.

Waters and his wife spent Tuesday night with Judy Petty in Brunswick. The next morning, the three of them went to the mental health clinic in Waycross that had been treating Waters since 1978. He was given a shot of Prolixin Decanoate, a long term major tranquilizer.[2] Waters told his family that he wasn't sure where he was Friday but he thought he had got stuck in the swamp and had broken a shovel trying to dig his car out. They went to see if they could find the place. Waters drove to a place showing signs that an automobile had been stuck. Nearby was a broken shovel handle. Waters spent Wednesday night at home.

Ms. Petty finally reached Ed Dixon Saturday, May 3. Sunday afternoon, Waters' pistol was given to Dixon, who turned it over to GBI agent Curley.[3] Monday afternoon Agent Curley and Detective Wofford went to the Waters' residence in Waycross and asked Waters to accompany them to the State Patrol station in Waycross, two or three miles from Waters' house. There, after advising Waters of his rights, Agent Curley interrogated him. Waters said he couldn't really remember what he had done Friday afternoon but thought he may have got stuck in a swamp. He remembered that he had been wearing a light blue shirt, dark blue trousers and black boots. He admitted owning the .38 caliber pistol that had been given to Agent Curley.[4] He

---

[2] The nurse who gave Waters the injection testified that long term meant at least two weeks and maybe three or four.

[3] A picture of Waters, used in the photographic lineups, was also obtained at this time.

[4] It was shown that the pistol, a Taurus .38 caliber revolver, was purchased by Eurus Kelly Waters on October 14, 1974, from the Sport Shop in Waycross, Georgia.

admitted owning a black leather holster and a pair of handcuffs, but he couldn't remember where the cuffs were. He agreed to go back to the house to allow Agent Curley to look at the clothes, the holster and the ammunition for the gun.

They went back to Waters' house. Helen Waters got the ammunition and the holster and gave them to Agent Curley. Waters retrieved a light blue shirt and dark blue pants that he identified as being the ones worn by him on April 25th. At 4:15 p.m., Monday, May 5, 1980, Waters was placed under arrest.

On Wednesday, May 7, 1980, Agent Curley again questioned Waters. Curley told Waters he had been seen on Jekyll Island about 1:00 p.m. April 25th. Waters responded that he had been drinking that week. Agent Curley told Waters he thought Waters had done the killings. Waters looked down and then said, "All right. I'll tell you what I remember. I remember being on the beach that Friday. I remember shooting those two women. I saw them fishing, and I pulled my gun on them and sexually assaulted them. I remembered last night what happened." He went on to say that he saw the two women fishing and watched them awhile. As they were getting ready to leave, he walked up to them, pulled his gun out of his hip pocket and made them accompany him into the woods.[5] He gave the older woman (Ms. Culpepper) the handcuffs and ordered her to handcuff herself to the younger woman (Ms. Paseur). He admitted having oral sex with the older woman.[6] He said he shot the two women because after he got through with the oldest one, they flinched toward him.[7] He said he did not touch the younger woman except to tear her clothes off after he shot her. He said that as he left, he got a pocketbook out of their car, took seven dollars out of it, and threw the rest off the Satilla River bridge on the way home. He remembered being stopped by a deputy right after he threw the pocketbook away. When he got home he sprayed his gun with degreaser, reloaded it, and put it up.

Agent Curley showed Waters an aerial photograph of the New Marina area of Jekyll Island. Waters marked on the photograph where he had parked his car and where the women had been fishing. He drew a line indicating his path from the place of abduction to the

---

[5] Waters testified during the trial that he told them they were going with him or he would shoot them.

[6] The sex act was cunnilingus. Code Ann. § 26-2002 defines sodomy to include both anal and oral sex. Waters testified that while this was going on, Ms. Paseur was hysterically screaming.

[7] Waters testified that Ms. Culpepper had just finished pulling on her clothes when the women made a lunge at him and he shot them. He said he thought he shot Ms. Culpepper first and then Ms. Paseur.

place where the sex act and killings had taken place.[8] The last area he indicated was precisely where the body of Ms. Paseur had been found.

Roger Parian of the State Crime Lab examined the bullets and the gun. Five of the six bullets given to Agent Curley by Ms. Waters were Federal brand, .38 caliber Plus P semi-wadcutter hollow point cartridges. The other was a Federal brand, .38 Plus P round-nose lead cartridge. The bullet removed from the body of Ms. Paseur and the bullet found at the murder scene were .38 caliber semi-wadcutter hollow point lead bullets, probably Federal brand. The two death bullets had six lands and grooves with a right-hand twist and were probably fired from a Taurus or Rossi brand revolver. Test bullets fired from Waters' Taurus revolver showed similar lands and grooves but had microscopic striations distinctly different from those on the two death bullets. A subsequent examination of the barrel of Waters' gun with a stereo microscope revealed randomly placed nicks and gouges throughout the barrel, possibly caused by the insertion of a hard object such as a screwdriver into the barrel.

Waters' testimony during the trial was basically consistent with his confession. Additionally, he testified that he had twice tried to commit suicide. In 1964 he shot himself in the stomach with a .22 caliber rifle. In 1966 he drank a mixture of rubbing alcohol and white linament. He testified that he had been on medication for some time and that if he didn't take the medicine for three or four days, he would get very upset and emotional. He testified that he had not taken his medicine for several days prior to the killings.

Dr. Wiley Lewis began treating Waters in 1978 for an unspecified mental illness whose symptoms included agitation, anxiety, and restlessness. As a part of the treatment, Waters began taking Thorazine. Dr. Lewis testified that the last time he saw Waters, in July, 1979, Waters knew the difference between right and wrong.

On October 30, 1978, Waters went to the mental health clinic in Waycross. The psychiatric nurse who saw him recommended he continue taking his Thorazine and return November 8, 1978 for an evaluation by Dr. Lorenzo Lecumberri. Dr. Lecumberri, a psychiatrist employed by the State of Georgia at the Georgia Regional Hospital in Savannah, examined Waters and diagnosed schizophrenia, paranoid type. He took Waters off Thorazine and put him on Mellaril. Dr Lecumberri testified that Mellaril improves thought, decreases activity and controls anger and hostility. Dr.

---

[8] Waters testified at trial that this distance was approximately 100 yards.

Lecumberri last saw Waters November 26, 1979, at which time Waters was not psychotic, was in good contact with reality, and knew the difference between right and wrong.

Waters returned approximately every four weeks to the mental health clinic for medication monitoring until March 19, 1979. He did not return thereafter until April 30, when as previously stated, he was given an injection of Prolixin Decanoate.

After Waters was arrested, he was examined by Dr. Miguel Bosch, a psychiatrist in charge of the forensic psychiatric service at the Georgia Regional Hospital in Savannah, and Jerry Bowman, a psychologist for the forensic services program at the same hospital. Dr. Bosch concurred in the previous diagnosis of paranoid schizophrenia. However, he found Waters to be well oriented as to time, place, person, and situation. Waters' speech was coherent, relevant, and logical, and his thought processes showed no confusion or disorganization. He was not actively psychotic at the time of the examination nor, in Dr. Bosch's opinion, at the time he killed the two women on Jekyll Island. It was Dr. Bosch's opinion that on April 25, 1980, Waters was able to judge right from wrong and was not acting under the influence of a delusional compulsion. Ms. Bowman testified that she was unable to form an opinion as to whether Waters knew or did not know right from wrong on April 25, 1980.

Waters was sent to Central State Hospital in Milledgeville for additional evaluation. He was examined by Dr. Hosea M. Delatorre, the medical director of the forensic services division at the hospital, and Dr. Gerald Lower, the chief psychologist of the forensic services division. Dr. Delatorre did not concur in the diagnosis of schizophrenia; his diagnosis was anxiety neurosis. He testified that a person who feels anxious reacts differently than normal people, exaggerates his actions, and perhaps becomes violent at times, but is always in good contact with reality. In his opinion, Waters knew the difference between right and wrong at the time of the examination. Dr. Lower concluded that Waters knew the difference between right and wrong at the time of the offense.

Several lay witnesses, including Ben Rainey, Waters' brother-in-law, and Bobby Gene Strickland, a long time friend of Waters, testified that Waters knew the difference between right and wrong.

### The Guilt-Innocence Phase

(1) Defendant claims the trial court erred in denying his motion for change of venue. When a defendant moves for a change of venue, a trial judge must "hear evidence by affidavit or oral testimony in support of or against the motion; and if, from the evidence submitted,

the court shall be satisfied that an impartial jury cannot be obtained to try the case, the judge shall transfer it . . ." Code Ann. § 27-1201. Defendant's motion came on for a hearing December 2, 1980. Defendant presented testimony from representatives of the Florida Times Union, the Savannah Morning News and the Savannah Evening Press, the Brunswick News, and radio station WMOG. Thirty-five exhibits, consisting of articles from the newspapers and transcripts of radio broadcasts, were introduced into evidence. These accounts, most of which had apparently occurred several months prior to the hearing, were largely factual in nature.[9] Compare Murphy v. Florida, 421 U. S. 794 (95 SC 2031, 44 LE2d 589) (1975). The State offered testimony from various witnesses, including several defense attorneys, that Waters could get a fair trial in Glynn County.

"The decision to grant a change of venue lies within the discretion of the trial court, and its discretion will not be disturbed absent an abuse of that discretion . . . The test adopted by this court in determining whether or not a change of venue should be granted is whether the jurors summoned to try the case have formed fixed opinions as to guilt or innocence from unfavorable pre-trial publicity." *Patterson v. State,* 239 Ga. 409, 418 (238 SE2d 2) (1977). Accord, *Messer v. State,* 247 Ga. 316 (4) (276 SE2d 15) (1981); *Jordan v. State,* 247 Ga. 328 (5) (276 SE2d 224) (1981).

This case was tried January 19 through January 24, 1981. Seventy prospective jurors were examined. Most of them had heard at least something about the killings on Jekyll Island and the subsequent search for the killer. However, only twenty entertained any opinion at all as to defendant's guilt; only sixteen were challenged by defendant for prejudice resulting from pre-trial publicity; and only ten were excused by the trial court because they had stated they would not be able to put aside any prejudice arising out of the pre-trial publicity and render a verdict based upon the evidence.[10] Only 22.9 percent of the veniremen were challenged by the defendant for prejudice resulting from pre-trial publicity and only 14.3 percent were excused because they had fixed opinions of defendant's guilt as a result of pre-trial publicity. Either percentage would corroborate the absence of prejudicial community bias and we conclude the trial court did not abuse his discretion in denying defendant's motion for change of venue. *Messer v. State,* supra.

---

[9] The exhibits themselves were not included in the record on appeal. However, testimony concerning them, contained in the record, is sufficient to support the above assertions.

[10] Six jurors were disqualified because of their conscientious objections to the

(2) Defendant claims the trial court erred in refusing to disqualify five potential jurors because the answers they gave during voir dire showed them to be prejudiced as a result of pre-trial publicity.[11]

All of the five jurors admitted they had formed a belief as to defendant's guilt based on newspaper articles or radio newscasts. None had either seen the crime committed or heard any evidence under oath. One said initially that the defendant would have to put up evidence to overcome her belief of his guilt.[12] However, they all said they could put aside any preconceived notions they might have and decide the case based on the evidence presented and the law as charged to them by the court. Four of them, including the one who initially indicated the defendant would have to put up evidence, were informed of and indicated agreement with the defendant's presumption of innocence and the burden of proof resting on the State.[13]

"When a prospective juror has formed an opinion based on hearsay (as opposed to being based on his having seen the crime committed or having heard the testimony under oath), to disqualify such individual as a juror on the ground that he has formed an opinion on the guilt or innocence of a defendant, the opinion must be so fixed and definite that it would not be changed by the evidence or charge of the court upon the trial of the case." *Tennon v. State,* 235 Ga. 594, 595-96 (220 SE2d 914) (1975). Accord, *Taylor v. State,* 243 Ga. 222 (253 SE2d 191) (1979).

"Our strict rules as to juror disqualification for favor are offset by the large number of peremptory strikes allowed a defendant in most felony cases, 20 strikes for the defendant, 10 for the

---

death penalty. One juror was disqualified because of his service on the grand jury that had indicted Waters. Two others were struck, because of an inability to decide the case based on the evidence, for reasons unrelated to pre-trial publicity: one was a friend of Ms. Culpepper and her family; the other had a niece who had killed her (the niece's) husband and spent time in a mental institution. Altogether 19 jurors were struck from the panel, leaving the parties with 51 prospective jurors from which to obtain 12 jurors and two alternates.

[11] As stated previously, defendant unsuccessfully challenged six jurors for prejudice resulting from pre-trial publicity. Defendant does not appeal from the trial court's ruling as to the last of those six, probably because the jury, including two alternates, was entirely selected before this sixth juror was reached.

[12] See, *Young v. State,* 131 Ga. App. 553 (2) (206 SE2d 536) (1974).

[13] See, *Goughf v. State,* 232 Ga. 178 (1b) (205 SE2d 844) (1974). The questions about defendant's presumption of innocence and the burden of proof resting on the State were asked by the State and not objected to by the defendant. See Division (3) of this opinion, infra.

prosecution." *Jordan v. State,* supra, 247 Ga. at 340.

The trial court did not err in refusing to grant defendant's challenges for cause.

(3) During voir dire, defendant's counsel asked one of the prospective jurors: "If the State's evidence shows that Mr. Waters did the shooting, and if he himself said he did the shooting, would you be willing to listen to any other evidence about how it could have happened? [the juror: If he states . . .] Say he wasn't in his right mind when he shot them, would you listen to that?" The State's objection to the question was sustained by the trial court. Defendant contends the trial court erred in so ruling.

Code Ann. § 59-705 outlines the permissible scope of voir dire. *Jordan v. State,* supra, 247 Ga. at 339. Voir dire should allow both parties an opportunity to ascertain the ability of the prospective jurors to decide the case on its merits, with objectivity and freedom from bias and prior inclination. *Whitlock v. State,* 230 Ga. 700 (198 SE2d 865) (1973). However, no question should require a response from a juror which might amount to a prejudgment of the case. *Jones v. Parrott,* 111 Ga. App. 750 (2) (143 SE2d 393) (1965). Since the distinction between questions which ask jurors how they would decide issues of a case if and when such issues are presented and questions which merely inquire whether jurors can start the case without bias or prior inclination is not always crystal clear, the "control of the voir dire examination is vested in the sound legal discretion of the trial judge and will not be interfered with by this court unless the record clearly shows an abuse of that discretion." *Lamb v. State,* 241 Ga. 10, 12 (243 SE2d 59) (1978).

Hypothetical voir dire questions are not *per se* improper, *Atlanta Joint Terminals v. Knight,* 98 Ga. App. 482 (4) (106 SE2d 417) (1958), but a trial judge should be cautious in allowing counsel to propound questions which ask the juror to assume that certain facts will be proven. Such questions tend to improperly influence jurors. See, generally, 99 ALR2d 7, Anno: Jury-Voir Dire-Hypothetical Question.

The question propounded was ambiguous and confusing. Defendant's counsel now contends he was merely trying to ascertain whether the juror would refuse to consider an insanity defense regardless of the evidence or the charge of the court. However, the trial court, while sustaining the objection to the question as asked, informed counsel that he would be allowed to ask the juror if she would consider an insanity defense in light of the charge of the court, provided counsel did not attempt to predict what the evidence would show. Counsel chose not to ask the question in the manner suggested by the trial court. The juror did later state that she could decide the

case based on the evidence presented and the law as charged by the court.[14] We find no abuse of discretion and no merit to this enumeration of error.

(4) Defendant claims the trial court improperly sustained the State's objection to the following hypothetical question asked of Dr. Wiley Lewis, a medical doctor engaged in general practice in Waycross: "If the patient, Kelly Waters, on April 25, 1980, went up to two women whom he'd never seen before in a remote area of Jekyll Island, Georgia, caused them to be handcuffed together, caused them to lie down, caused one of them to undress from the waist down, committed oral sex with one of them, with that one, and then upon their flinching shot both of them with a .38 caliber revolver, what would be your opinion as to his mental condition?"

The State's objection was that the defendant was asking the witness to draw a conclusion based on facts with which the witness was not personally familiar. However, a witness who has qualified as a practicing physician is qualified to testify as an expert witness on the question of sanity. *Williams v. Trust Co. of Ga.,* 180 Ga. 73 (2) (178 SE 295) (1934); *Petty v. Folsom,* 229 Ga. 477 (192 SE2d 246) (1972). The opinion of an expert "may be given on the facts as proved by other witnesses." Code Ann. § 38-1710. The question should have been allowed, and the trial court erred in sustaining the State's objection.

Later in the trial, the court told defendant's counsel that, after further consideration, he was not sure the question was improper and if counsel wanted to recall the witness and repeat the question the court would allow him to do so. Defendant was, in fact, allowed to ask virtually identical hypothetical questions of two other doctors. Dr. Lecumberri was unable to answer the question. Dr. Bosch responded that the question had two answers: the person knew what he was doing, or the person did not know what he was doing; either would be consistent with the hypothetical facts. After neither of these two witnesses could answer the hypothetical questions, defendant elected not to recall Dr. Lewis.

In view of defendant's failure to re-ask the question when provided an opportunity to do so, we find this enumeration of error to be without merit.

(5) Defendant contends the trial court improperly sustained

---

[14] This juror was one of the six challenged for cause by the defendant, but not excused. She was later peremptorily challenged by defendant and did not serve on the jury which convicted him.

the State's objection to a question propounded to Bobby Gene Strickland, a co-worker and friend of defendant for seven or eight years: "Now, the kind of fellow that you knew Kelly Waters to be, and from the length of time that you had known him, would you say that, in your opinion, if he had kept the same faculties about him that you knew him to have and retained the same personality you knew him to have, do you think he was the kind of man that could have shot two women?"

Strickland had already testified that Waters had always acted normal to him; Strickland noticed nothing unusual about his behavior. Strickland testified Waters didn't drink much, never got into trouble; he was a well-behaved, accommodating, somewhat timid person. He subsequently testified that Waters was sane and knew the difference between right and wrong.

Defendant contends the question asked for an opinion as to his mental competence and that the court erred in sustaining the objection to the question because it kept the witness from expressing an opinion on a crucial point of Waters' defense of insanity. The State concedes a lay witness may ordinarily give his opinion as to the state of mind or mental condition of another, see, *Dix v. State,* 238 Ga. 209 (2) (232 SE2d 47) (1977) and *Jarrard v. State,* 206 Ga. 112 (2,3,4,5) (55 SE2d 706) (1949), but argues a lay witness may not answer a hypothetical question incorporating facts not testified to by the witness. See, *Callahan v. State,* 209 Ga. 211 (2) (71 SE2d 86) (1952).[15]

We cannot agree that the question was improper because it incorporated facts not testified to by the witness. However, we do not agree with the defendant that the trial court erred in sustaining the State's objection to the question.

Strickland could not give an opinion as to defendant's sanity at the time of the offense; he wasn't there, and a lay witness must testify from personal observation. He could, and did, testify that Waters was sane and acted normal prior to the murders. This, of course, was circumstantial evidence that Waters was sane at the time of the offense. It is apparent that the question was designed to show indirectly what could not be shown directly: that Waters was insane

---

[15] The State's original objection was that the question called for an opinion on a matter not subject to opinion evidence. The State relied on *Harris v. State,* 188 Ga. 745 (1) (45 SE2d 651) (1939) which says, "[t]he opinion of a witness is not admissible as evidence when all the facts and circumstances are capable of being clearly detailed and described, so that the jurors may be able readily to form their own conclusion therefrom."

at the time of the offense. Defendant wished to show inferentially that since he was ordinarily not the kind of man that would shoot two women, he must have been insane when he did in fact shoot two women. The question did, therefore, as defendant contends, relate to his defense of insanity.

The question, essentially, was: "Was the Kelly Waters you knew the kind of man that could have shot two women?" The question calls for an opinion of the defendant's character. Character is circumstantial evidence of conduct and state of mind. McCormick on Evidence, Ch. 17, § 188 (2d Ed. 1972). A person is more likely to act in accord with his character than contrary to it. Green, Ga. Law of Evidence, § 65, p. 160. Thus a defendant may present evidence of his good character as a substantive fact indicative of his innocence. It may, by itself, create a reasonable doubt as to his guilt. *Seymour v. State,* 102 Ga. 803, 805 (30 SE 263) (1897).

However, the rule in Georgia is that good character may be proved only by testimony of a witness as to the reputation of the person whose character is in issue. *Powell v. State,* 101 Ga. 9 (29 SE 309) (1897); *Wilson v. State,* 190 Ga. 824 (3) (10 SE2d 861) (1940). Subject to minor exceptions, the opinion of a witness as to character based on personal observation is not an approved way of introducing evidence of character. Agnor's Georgia Evidence, § 10-4, p. 166. Therefore, the trial court did not err in disallowing defendant's question calling for such an opinion.

(6) The trial court did not err in refusing to give defendant's request to charge on insanity. "The failure to give requested instructions in the exact language requested, where the charge given substantially covers the same principles, is not grounds for reversal." *Kelly v. State,* 241 Ga. 190 (4) (243 SE2d 857) (1978).

(7) The trial court did not err in charging the jury on flight as evidence of guilt. That Waters did not remain at the scene of the offense is circumstantial evidence of his guilt and of his knowledge of his guilt. This is particularly true when coupled with his efforts to conceal evidence (throwing the purse into the river and spraying the gun with degreaser).

(8) The evidence presented at trial has been set out previously in great detail. The evidence supports the two guilty verdicts and the necessarily included finding by the jury that Waters was sane.

### The Sentencing Phase

After finding Waters guilty on both counts, the jury found three aggravating circumstances as to each murder. As to Count One of the Indictment (the murder of Anita Paseur), the jury found the murder

was committed during the commission of the capital felonies of kidnapping with bodily injury of Kathryn Culpepper, the murder of Kathryn Culpepper, and the aggravated sodomy of Kathryn Culpepper. As to Count Two of the Indictment (the murder of Kathryn Culpepper), the jury found the murder was committed during the commission of the capital felonies of kidnapping with bodily injury of Anita Paseur, the murder of Anita Paseur, and the aggravated sodomy of Kathryn Culpepper.[16] The jury recommended the punishment of death as to each count.

(9) Defendant contends the trial court should not have charged kidnapping to the jury during the sentencing phase of the trial because there was no evidence to show a kidnapping occurred, in that there was no "abduction" or "stealing away."

"A person commits kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will." Code Ann. § 26-1311. The undisputed evidence showed that Waters forced two women at gunpoint to march 100 yards from their car to a woods. The evidence thus shows a kidnapping did occur. See *Brown v. State,* 132 Ga. App. 399 (2) (208 SE2d 183) (1974); *Carroll v. State,* 143 Ga. App. 230 (237 SE2d 703) (1977); *Rubiano v. State,* 147 Ga. App. 142 (2) (248 SE2d 207) (1978).

(10) The trial court did not err in failing to charge whether or not aggravated sodomy can constitute bodily injury, with respect to the aggravating circumstance of kidnapping with bodily injury, in the absence of a request for such a charge by the defendant or the jury. That Code Ann. § 26-1311 does not define "bodily injury" does not render that portion of the statute punishing kidnapping with bodily injury unconstitutionally vague. *Peek v. State,* 239 Ga. 422 (4) (238 SE2d 12) (1977). A bodily injury includes any injury to the body. Since both victims of the kidnappings were killed, they received injuries to their bodies. The failure of the court to instruct the jury that an aggravated sodomy can constitute a bodily injury within the meaning of the kidnapping statute, *Presnell v. State,* 243 Ga. 131 (1) (252 SE2d 625) (1979), could only have been beneficial to the defendant.

(11) Defendant contends aggravating circumstance number one of Count Two (alleging the murder of Kathryn Culpepper was

---

[16] We are paraphrasing, not quoting, the findings of the jury. The aggravating circumstances were stated separately and tracked the language of the statute. See Code Ann. § 27-2534.1 (b)(2).

committed while the offender was engaged in the commission of another capital felony, kidnapping with bodily injury to Anita Lynette Paseur) is not supported by the evidence. He says the only bodily injury received by Ms. Paseur was the gunshot wound that killed her and that her murder cannot constitute the bodily injury component of her kidnaping because aggravating circumstance number three of Count Two alleges that the murder of Ms. Culpepper was committed while the offender was engaged in the commission of another capital felony, the murder of Anita Paseur. Therefore, says defendant, one murder is used to support two aggravating circumstances. This contention is incorrect. Kidnapping with bodily injury and murder are two separate crimes, that is, one is not included in the other, even if the homicide is the bodily injury of the kidnapping. *Potts v. State,* 241 Ga. 67 (11) (243 SE2d 510) (1978); *Stephens v. Hopper,* 241 Ga. 596 (1) (247 SE2d 92) (1978); *High v. State,* 247 Ga. 289 (12) (276 SE2d 5) (1981); *Brown v. State,* 247 Ga. 298 (9) (275 SE2d 52) (1981).

Since there is no bar to using the fatal injury to Ms. Paseur as the bodily injury component of the capital felony of kidnapping with bodily injury, even though the same fatal injury supports the capital felony of murder, it follows that aggravating circumstance number one of Count Two was supported by the evidence.

(12) The imposition of the death penalty for the murder of Kathryn Culpepper is supported by the aggravating circumstance that her murder was committed during the murder of Anita Paseur. The death penalty for the murder of Anita Paseur is supported by the aggravating circumstance that her murder was committed during the murder of Kathryn Culpepper. The two aggravating circumstances are therefore mutually supporting within the meaning of *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974). Compare *Peek v. State,* supra, 239 Ga. at 429; *Strickland v. State,* 247 Ga. 219 (23) (275 SE2d 29) (1981). One aggravating circumstance must be set aside. We arbitrarily eliminate the aggravating circumstance supporting the death penalty for the murder of Kathryn Culpepper, that the murder was committed during the murder of Anita Paseur.

(13) Two other aggravating circumstances, that the murder of Ms. Culpepper and Ms. Paseur were committed during the commission of another capital felony, the aggravated sodomy of Ms. Culpepper, must also be set aside. Code Ann. § 26-2002 (Ga. L. 1968, pp. 1249, 1299) provides that a "person convicted of aggravated sodomy shall be punished by imprisonment for life or by imprisonment for not less than one nor more than 20 years." While "capital felony" as that term is used in Code Ann. § 27-2534.1 (b)(2) includes felonies which were capital crimes in Georgia at the time this

section of our death penalty statute was enacted in 1973, even as to those offenses for which the death penalty may, as a result of judicial construction, no longer be imposed, *Peek v. State,* supra, the present aggravated sodomy statute has never provided for the death penalty. Code Ann. § 26-2002 provides for a maximum of life imprisonment. Thus, aggravated sodomy is not a "capital felony" in any sense of that term. Since it is not otherwise listed in § 27-2534.1 (b)(2), it may not be used as a (b)(2) aggravating circumstance to support a death penalty.

(14) There remain the following aggravating circumstances: As to Count One of the Indictment (the murder of Anita Paseur), the murder was committed during the commission of two other capital felonies: Kidnapping with bodily injury of Kathyrn Culpepper; murder of Kathryn Culpepper. As to Count Two of the Indictment (the murder of Kathryn Culpepper), the murder was committed during the commission of another capital felony: kidnapping with bodily injury of Anita Paseur.

## Sentence Review

The death penalties imposed in this case must be reviewed by this court under the standard set forth in Code Ann. § 27-2537 (c)(1-3). Thus, we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's finding of the statutory aggravating circumstances; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

(15) Upon review of the entire transcript and record in this case, this court concludes that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

(16) The evidence supports a finding of the aggravating circumstances, as set forth in Division 14, by a rational trier of fact beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Although for reasons noted in Divisions 12 and 13, we have set aside three aggravating circumstances found by the jury, the failure of one or more aggravating circumstance does not taint the proceeding so as to invalidate the other aggravating circumstances found by the jury in the sentence of death based thereon. *Stevens v. State,* 247 Ga. 698 (278 SE2d 398) (1981); *Burger v. State,* 245 Ga. 458 (265 SE2d 296) (1980).

(17) We have reviewed the trial court's charge to the jury and find it is not subject to the defects dealt with in *Hawes v. State,* 240 Ga. 327 (9) (240 SE2d 833) (1977), and *Fleming v. State,* 240 Ga. 142

(7) (240 SE2d 37) (1977). Here the charge included application of mitigating circumstances and informed the jury they could recommend life sentences even if they found the existence of a statutory aggravating circumstance.

(18) In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which death or life sentences were imposed and find that similar cases listed in the appendix attached hereto support the affirmance of the death penalties in this case.

Defendant contends the death penalties should be set aside because the murders occurred at a time when he was under no medication, was drinking alcohol and was alone at a remote fishing spot with a pistol and handcuffs and encountered two women. Defendant contends that some emotional force was acting upon him that was sufficient to dethrone his reason and silence his inhibitions. He contends that for the good of society he ought to be allowed to live so that his particular personality can be studied. We disagree. The evidence clearly shows that Waters was not incapacitated or unable to form the requisite criminal intent. Aside from the medical testimony as to his competence, we note that Waters came to the beach with his pistol and a pair of handcuffs and approached at least one other woman before he kidnapped and murdered the victims in this case. He fled the scene immediately after the murders, discarded the pocketbook he stole and took the time after he got home to clean and reload his gun.[17] "Juries have given the death penalty in cases in which the defendant had no prior criminal record and where evidence of use of alcohol or drugs was offered in mitigation." *Tucker v. State,* 244 Ga. 721 (13) (261 SE2d 635) (1979). See also *Strickland v. State,* 247 Ga. 219 (275 SE2d 29) (1981); *Bowen v. State,* 244 Ga. 495 (260 SE2d 855) (1979); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1970).

We conclude that defendant's sentences of death are not excessive or disproportionate to the penalty imposed in similar cases, taking into consideration both the crime and the defendant.

*Judgment affirmed. Jordan, C. J., Marshall, Clarke and Smith, JJ., concur. Hill, P. J., concurs in the judgment only as to Divisions 11 and 14.*

DECIDED OCTOBER 8, 1981 —
REHEARING DENIED OCTOBER 27, 1981.

---

[17] There is also evidence that someone had tampered with the barrel of the gun in a way that would hamper a ballistics comparison. Waters was at one time a jailer for the City of Waycross.

*John W. Davis, Donald E. Manning,* for appellant.

*Glenn Thomas, Jr., District Attorney, John B. Johnson III, Assistant District Attorney, Arthur K. Bolton, Attorney General, Harrison Kohler, Assistant Attorney General,* for appellee.

### APPENDIX.

*Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Gibson v. State,* 236 Ga. 874 (226 SE2d 63) (1976); *Moore v. State,* 240 Ga. 807 (243 SE2d 1) (1978); *Westbrook v. State,* 242 Ga. 151 (249 SE2d 524) (1978); *Johnson v. State* 242 Ga. 649 (250 SE2d 394) (1978); *Collins v. State,* 243 Ga. 291 (253 SE2d 729) (1979); *Brooks v. State,* 244 Ga. 574 (261 SE2d 379) (1979); *Gates v. State,* 244 Ga. 587 (261 SE2d 349) (1979); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981); *Blankenship v. State,* 247 Ga. 590 (277 SE2d 505) (1981).