## 38110. PAYNE v. THE STATE.

JORDAN, Chief Justice.

Joseph Leslie Payne was convicted by a jury in Cobb County for the murder of twenty-two month old Caleb Joseph Reynolds, the son of Julia Reynolds, his live-in lover, who later, before trial, was to become his wife. After being sentenced to life imprisonment, he appeals. We affirm.

1. Three theories were pursued by the defense. First, the

defense asserted that although Caleb's father, Tim, had legal custody, and Caleb's mother, Julia, had visitation rights, Caleb's physical custody often had been exchanged between his mother and her live-in lover, the defendant, on the one hand, and his father and his father's live-in lover, Deborah, on the other. Accordingly, the defense sought to prove that any one of those four persons might have inflicted the injuries.

The second theory of defense was that one or more of the defendant's two daughters, aged two and eight, had jumped on Caleb's stomach while at play, and that defendant's daughters and Caleb had been sliding down some steps together, this accounting for the many bruises and abrasions found on Caleb's body.

The third defense theory was that the defendant accidentally stepped on Caleb's stomach, then, while stumbling, accidentally kicked Caleb in the head, when the defendant was reaching for some musical equipment that the younger of his two daughters was tipping over.

Each defense theory was supported by the exculpatory pre-trial statements given by defendant after appropriate Miranda warnings.

Defendant's testimony during trial supported the version of events about his accidentally having stepped on and kicked Caleb, whereas the child's mother's testimony supported the theory that Caleb had been injured while at play with the defendant's children.

The state's forensic medical evidence was that Caleb's many and varied injuries were not consistent with trauma that might have been sustained from sliding down stairs or by being jumped on by one or more young children. Rather, that the death-producing blow to Caleb's abdomen was delivered by a blunt instrument applied with considerable force consistent with Caleb's having been kicked by the defendant while the defendant was wearing his cowboy boots that were in evidence. The state's evidence indicated that this severe blow to Caleb's abdomen ruptured Caleb's intestines, and that another severe blow was delivered to Caleb's head which itself would have been sufficient to produce death had the kick to the abdomen not done so. The head kick was regarded by the state's doctors as a contributing cause of death.

The state's evidence indicated that all of the many and various injuries Caleb had sustained, including the death-producing blows to his abdomen and head, had been meted out within the twenty-four hour period before his death.

Caleb died in his sleep after he had been returned at night by his mother to his father and Deborah, who immediately had noticed his injuries and had planned to take him to the doctor the next morning.

Caleb was found dead in his crib by his father the next morning.

Caleb had spent a restless and sometimes sleepless night in great pain from his injuries. He had demanded but was unable to swallow liquids. Once during the night while awake he had told Deborah, "Hurt, Joe hurt." The defendant Joseph Leslie Payne is known as "Joe."

No witness testified to having seen the defendant kick or otherwise strike Caleb. However, it was in evidence that Caleb feared the defendant and cried when left alone with him.

A family physician testified that Caleb had been for several months a victim of periodic child abuse, known as "battered child syndrome," some instances of which were indicated to have occurred at a time prior to the date when defendant's evidence indicated he had begun to live with Caleb's mother. The state's evidence in respect to this last point was that the defendant and Caleb's mother had commenced living together within two weeks of her divorce from Caleb's father.

A pattern of child abuse and neglect had led to Caleb's legal custody being changed from his mother to his father with his mother nonetheless having been awarded liberal visitation rights. Continuation of the pattern of abuse and neglect during visitation periods had led Caleb's father to desire to terminate or at least to materially restrict Julia's visitation rights, and with this in mind a neighbor and friend photographed Caleb's injuries sustained on the night before he died.

The defendant did not argue the general grounds. Had he done so, we would not have hesitated to hold that the evidence was legally sufficient to convict when viewed in light of the current legal standard. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Payne first complains of the introduction in evidence of testimony indicating that Caleb had been physically abused on several occasions over a period of months. He contends that the requirement of *French v. State,* 237 Ga. 620, 621 (229 SE2d 410) (1976), that "there must be evidence that the Defendant was in fact the perpetrator of the independent crime" was not satisfied.

The state contends the evidence of previous beating was not admitted to prove "other crimes" in the sense of *French v. State,* supra, but as circumstantial evidence of a pattern of child abuse corroborating the testimony of Caleb's pediatrician that Caleb was a victim of "battered child syndrome." *Lackey v. State,* 246 Ga. 331 (271 SE2d 478) (1980). The state also contends that no objection was made to introduction of evidence about the periodic beatings on the ground that it put Payne's character in evidence, and, further, that

Payne put his own character in evidence.

Assuming without deciding that a proper objection was made, we find no error. At trial, Payne admitted he kicked and stepped on Caleb on the evening before Caleb's death but testified that he did so by accident or mistake while reaching for some musical equipment his younger daughter was tipping over. Testimony about physical injuries sustained by Caleb on several occasions during previous months while in the physical custody of his mother and Payne was admitted by the state to rebut the defense of accident or mistake. We agree with the state that testimony about this pattern of abuse was admissible to rebut the defense theory of accident or mistake. *Smith v. State,* 154 Ga. App. 497, 499-500 (268 SE2d 714) (1980). The first enumeration of error is wanting in merit.

3. The recent decision of this court in *Sabel v. State,* 248 Ga. 10, 16 (6) (282 SE2d 61) (1981), was not the law of Georgia when the trial court was called upon to pass upon the defense's pre-trial motion for an independent autopsy of Caleb's body. Rather, at that time, *Moore v. State,* 240 Ga. 807 (5) (243 SE2d 1) (1978), remained the law, and independent expert examination of critical evidence was limited to examination of alleged prohibited substances critical to conviction in drug cases. 248 Ga. at 17.

The time frame with which the trial court was faced was this: At approximately 3:00 p.m. on the afternoon of December 12, 1979, the trial court learned that Caleb's body already had been embalmed and cosmetically prepared for viewing which was to commence at 7:00 p.m. that day. The court heard testimony by Dr. Stivers, defendant's expert, that although he could perform a second autopsy that afternoon, the probability of his establishing different physical findings from those noted by the state's expert, Dr. Burton, was unlikely.

The trial court denied the defendant further access to Caleb's bodily remains, but did make available to Dr. Stivers all of Dr. Burton's notes, findings and photographs, and the tissues and fluids upon which Dr. Burton's experiments were based.

The strong implication from, if not the express meaning of, Dr. Stivers' testimony during the motion hearing is that Dr. Burton's opinion that Caleb died as a result of peritonitis caused by rupture of his intestines, with swelling of the brain resulting from injuries to his head being a contributing cause, was not "subject to varying expert opinion" within the meaning of *Sabel,* supra.

Although *Moore* not *Sabel* controlled the trial court's actions, the court nonetheless carefully considered and balanced the right of the defendant to examine evidence critical to his defense against the right of Caleb's parents to proceed with the funeral arrangements

that already were underway.

Had *Sabel* been the law, the trial court would not have abused his discretion by holding that the defense motion for a second autopsy was not "timely." Caleb's remains no longer were within the state's control. Rather, they had been released to his parents, embalmed, and cosmetically prepared for the traditional visiting prior to the funeral services. Further, the request for the second autopsy was "general" not "specific." *Sabel*, 248 Ga. at 18.

If *Sabel* had been the law, the state would have been entitled to comment upon the fact that the defense never called Dr. Stivers to testify during Payne's trial for Caleb's murder. 248 Ga. 18.

The second enumeration of error lacks merit.

4. One defense theory was that Payne accidentally stepped on Caleb while reaching for some musical equipment that his younger daughter was tipping over. Payne had supported this theory by his own testimony during trial, as well as by some of his pre-trial statements.

The state called as a witness Investigator Ronald W. Bass of the Cobb County Police Department, who testified to substantially the same facts regarding the musical equipment and its positioning as had the defendant, but who then gave his opinion, based on his observations, that the equipment was stable and that it could not have been pushed over easily by a two-year-old child. In this last regard only did the substance of his testimony contradict that of the defendant, which had been that the equipment was unstable and was being pushed over by his two-year-old daughter.

Payne contends that the investigator's testimony was as to an experiment he performed to determine the equipment's stability, and that the trial court should have excluded the results of the stability experiment because there was no showing that the conditions under which the investigator performed the experiment were sufficiently similar to the actual event.

The state contends that the investigator did not perform an experiment. Rather, that he merely observed the crime scene, testified about observed facts, and, having given the underlying facts, that he gave his opinion about the stability of the equipment.

Assuming, arguendo, that the investigator's actions in pushing on the equipment were an experiment, we conclude that no manifest abuse of discretion in admitting his testimony has been illustrated on appeal. *West v. State*, 200 Ga. 566 (37 SE2d 799) (1946). Any variances between the physical condition or positioning of the musical equipment at the time of the alleged event and at the time of the investigation would be matters particularly within the knowledge of the defendant and not within the knowledge of the investigator.

Such variances go to the weight, not to the admissibility, of the investigator's testimony regarding the experiment. *West,* supra. The third enumeration of error is without merit.

5. The trial court did not err by failing to charge the law of involuntary manslaughter because there was no request for such a charge. *State v. Stonaker,* 236 Ga. 1 (222 SE2d 354) (1976).

6. Payne contends that he was denied effective assistance of counsel because his retained attorneys failed to object to the introduction of some hearsay evidence; because they delayed the trial, resulting in admonitions from the court; and because they failed to request a charge on the law of involuntary manslaughter.

Specific mention is made of the introduction of Deborah's testimony that Caleb told her during the night before his death, "Hurt, Joe hurt." Also specifically mentioned is the court's admonition during the first Jackson-Denno hearing to avoid irrelevant matters.

A review of the record indicates that defense counsel were "reasonably effective." Their trial strategy ought not to be adjudged ineffective by hindsight simply because Payne was convicted of murder. *Solomon v. State,* 247 Ga. 27 (277 SE2d 1) (1981); *Pitts v. Glass,* 231 Ga. 638 (203 SE2d 515) (1974).

Although hearsay evidence was introduced without objection on several occasions, the jury either already had heard or soon thereafter was to hear the identical, or substantially similar, statements made by the first-hand witnesses. No harmful error has been illustrated pertaining to the introduction of hearsay evidence.

On the other hand defense counsel offered some forty-nine objections which were sustained, and managed successfully during pre-trial motions to exclude from evidence all mention of polygraph testing. Defense counsel demonstrated familiarity with the facts of the case, and vigorously, although unsuccessfully, pursued theories of defense which could have exonerated the defendant of any charge.

The fifth enumeration of error is wanting in merit.

7. In his last enumeration of error, Payne contends that the trial court erred by failing to make a finding of voluntariness before submitting his statements to the jury.

The applicable constitutional requirement was stated succinctly in Sims v. Georgia, 385 U. S. 538, 543-544 (87 SC 639, 17 LE2d 593) (1967), as follows: "[A] jury is not to hear a confession unless and until the trial judge has determined that it was freely and voluntarily given. The rule allows the jury, if it so chooses, to give absolutely no weight to the confession in determining the guilt or innocence of the defendant but it is not for the jury to make the primary determination of voluntariness. Although the judge need not

make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity."

The courts of Georgia have recognized that "A mere ruling of the trial judge that he finds the [voluntariness] issue in dispute and will let it go to the jury is insufficient." (Matter in brackets added.) *Jackson v. State,* 124 Ga. App. 488 (2), 489 (184 SE2d 185) (1971).

The trial court's first ruling from the bench during the first Jackson-Denno hearing was as follows: "I am going to instruct the jury as to their finding in connection with the hearing; whether they find it to be free and voluntary and, if they don't, they will disregard it. The only concern this Court has is whether or not he originally signed the waiver of rights. If he says he couldn't read, didn't understand, drunk or something like this, this is all I am concerned with." A second ruling was: "I will let a jury hear all that and let them determine." The third or final ruling was: "I will deny your motion [to suppress] and let the jury hear the evidence, and I will instruct them if they find that it was not voluntarily given, to disregard it. I think it's proper." (Matter in brackets added.)

We were of the opinion that no conclusion of the trial court that Payne's statements were voluntary appeared from the record "with unmistakable clarity," and that it was "therefore impossible to know whether the judge thought the confession voluntary." 385 U. S. at 544. Accordingly, we remanded the case to the trial court by order for a proper Jackson-Denno hearing and a finding as to voluntariness as mandated by Sims v. Georgia, supra. This procedure was authorized in Jackson v. Denno, supra, and frequently has been employed by the appellate courts of this state. *Cofield v. State,* 247 Ga. 98, 106 (4) (274 SE2d 530) (1981); *Pittman v. State,* 245 Ga. 453, 455 (265 SE2d 592) (1980); *Lawrence v. State,* 241 Ga. 36, 37 (1) (243 SE2d 78) (1978); *Pierce v. State,* 238 Ga. 126, 129 (231 SE2d 744) (1977); *Schneider v. State,* 130 Ga. App. 3 (1) (202 SE2d 238) (1973).

Upon remand, the trial court conducted a proper Jackson-Denno hearing, and the transcript of that proceeding now is before this court. The trial court considered the "totality of the circumstances" surrounding the statements. *Pierce v. State,* supra, at 129. The finding of the trial court that Payne's statements were voluntary appears "with unmistakable clarity" from the record on appeal. After reviewing the transcript of the second Jackson-Denno hearing, we conclude that the court's finding as to the voluntariness of the statements is not "clearly erroneous." The final enumeration of error thus is without merit. *Cofield v. State,* supra, at 108.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 21, 1982 —
REHEARING DENIED MAY 4, 1982.

*Barnes & Browning, Roy E. Barnes, Thomas J. Casurella,* for appellant.

*Thomas J. Charron, District Attorney, Amy A. Hembree, Assistant District Attorney, Michael J. Bowers, Attorney General, Charles E. Brown, Assistant Attorney General,* for appellee.

ON MOTION FOR REHEARING.

Payne contends on motion for rehearing that his in-custody statements were inadmissible because his Miranda rights were violated when the investigating officers immediately did not cease their questioning of him after he indicated to them during his interrogation that he wanted a lawyer present.

On direct examination during the second Jackson-Denno hearing, Payne testified that he told the investigating officers he wanted a lawyer. Then, on cross-examination, he admitted that he never specifically asked the officers for a lawyer. Rather, that within the hearing of at least one of the investigating officers, he asked his brother Kenneth, over the telephone, to get him a lawyer.

On direct examination, the defendant's brother, Kenneth Payne, testified that Payne called him from the jail and told him "to get in touch with my sister to get Don Clark, who is a lawyer, to come and help him. . . ." On cross-examination, Kenneth Payne testified that the first thing Payne said to him over the telephone was "get me a lawyer."

The investigating officers testified that Payne never asked them for a lawyer, although they gave him his Miranda rights immediately before commencing each of the three periods of questioning, and that Payne did not request a lawyer during his telephone conversation with his brother, Kenneth.

The trial court resolved the foregoing conflict in the testimony by finding that Payne made a telephone call to his brother from the jail during which he requested that his brother obtain for him the services of Don Clark, who is an attorney, but that he did not communicate his request for legal counsel to anyone other than his brother. The court further found as a fact that Payne did not subsequently request of the officers the services of an attorney although he was informed of his right to counsel three times during the questioning that evening.

The findings of the trial court in the order entered after the second Jackson-Denno hearing harmonize the conflicting testimony regarding Payne's request to his brother for legal counsel, and are not

clearly erroneous. *Gates v. State,* 244 Ga. 587, 590 (261 SE2d 349) (1979). No error has been made to appear regarding this claimed Miranda violation.

*Motion for rehearing denied.*