39360. FRANKLIN v. THE STATE.

BELL, Justice.

Wayne Franklin appeals his conviction and life sentence for the murder of his twenty-month-old daughter, Nickey Delilah Nicey. There was evidence at trial showing that prior to her death Nickey was living in the same household in Vienna, Ga., with her mother, Marie Nicey, and other relatives including two maternal aunts, Melissa and Mary Alice Nicey. In addition, Franklin sometimes lived there. There was testimony that on occasion Marie and Franklin quarrelled with each other. On the evening of May 7, 1981 they argued over the fact that she was carrying another man's baby, and he hit her on the head with his hand. They had argued on other

occasions, but this was the first time he hit her.

Marie's practice was to bathe Nickey each evening, and when she bathed her that night the child did not appear to have any bruises. The next morning Mary left for school and Marie and Melissa left the house on some errands, leaving Nickey alone with Franklin and in his care. Mary returned home from school at three-thirty p.m. Nickey was on the bed and Wayne was elsewhere in the house; the baby was not moving, and appeared to be sleeping. When Marie and Melissa returned about four p.m. Franklin was holding the child, who appeared limp or numb and was wearing different pants than she had that morning; appellant said nothing at that time about her being ill. Later that day Marie and Wayne argued again. He accused her of seeing her unborn child's father while she was out, and hit her on the buttocks. Later that evening he brought Nickey to Marie and told her he had seen the baby vomiting blood outside the house, but when Marie checked the yard she only saw a stain in the dirt which looked and smelled like hot sauce. She told Franklin it was hot sauce, and accused him of feeding Nickey hot sauce, which he denied. Appellant then said the child was sick and he was going to take her to the hospital. Neither he nor Marie had a car and he left the house on foot, walking fast and carrying the child. Marie, Melissa, and Mary Alice followed him, also on foot. Marie had not seen any bruises on the child and, despite Nickey's eyes being "turned all up," did not think anything serious was wrong with her. Nevertheless, before Franklin left she asked to examine Nickey, but he refused. A motorist saw appellant carrying the baby, and she picked the two of them up. Wayne told her the baby had fallen down some steps and hurt herself, and had started vomiting blood. The motorist agreed to take him and the baby to the hospital, but at his request first returned to the three women to get a Medicaid card from Marie. While the card was being obtained, someone (the evidence is in conflict as to exactly who) said there was nothing wrong with the baby. Wayne said there was something wrong, that she was throwing up blood. Marie replied that she had been eating hot sauce, and she smelled it on the child's breath. Wayne told her that did not make sense, that she had not been eating hot sauce, and at that point he asked the motorist to start driving for the hospital. At the hospital he seemed upset and very concerned about the child, and he told the charge nurse Nickey had fallen down some steps while he had been out back chopping some wood. At first the nurse did not see any injuries except a small knot on Nickey's forehead, but when she raised her shirt she found multiple bruises; however, she saw no abrasions. When Marie arrived, the nurse showed her the bruises. Marie was very surprised and upset, and she asked Wayne how the child had gotten them. At first he

maintained she had fallen down the steps of Marie's house, but then he admitted he had "whupped" her for wetting in her clothes. Melissa was listening to them talk, and heard him make this admission. The baby died May 9 at two-twenty-three a.m. Marie visited Franklin after he had been jailed, and he told her another version of events. He claimed that he had left the house to cut some wood, had returned and seen a car leaving the yard, had found Nickey in the house, and had then discovered that Nickey's lip had been "burst."

Warren Tillman, a pathologist with the Georgia State Crime Laboratory, testified he had performed an autopsy on Nickey and had found twelve to fifteen fresh circular bruises on her torso and buttocks which were consistent with the baby having been beaten with a fist within thirty-six hours of death. Her brain had been injured and had hemorrhaged within the past thirty-six hours, and her liver had been lacerated, causing severe abdominal bleeding. In his opinion the injuries she suffered were not consistent with appellant's contention that she had fallen down concrete steps. He noted that such a fall would have caused skin abrasions, and he had found none. He did not find evidence of any injury which might have caused her to throw up blood. His opinion was that she had suffered multiple blunt injuries and had died of the brain hemorrhage and liver laceration, which was consistent with having been beaten to death.

A Georgia Bureau of Investigation investigator who had previously worked on fifty or sixty child abuse cases testified he had examined the steps and found them to be of fairly smooth finished concrete, and to be twenty-eight inches high. He said that if Nickey had fallen down the steps she should have suffered some skin abrasions, and his opinion was that the injuries she had received were not consistent with such a fall. There was additional testimony by a Georgia Bureau of Investigation forensic toxicologist that she had analyzed the stain in the dirt outside Marie's house, and it appeared to be similar to hot sauce.

The state also introduced evidence establishing that Franklin had a history of abusing the child. On one occasion in May of 1981 he forced her to march like a soldier under the hot sun while he chanted "hut one, two, three, four." She wept and begged for water, and when Marie tried to interfere, he picked up the child and ran off. There was testimony that Nickey could walk and say a few simple words, but was not toilet trained, wore diapers or Pampers, could not change herself, and did not know how to ask to go to the bathroom. Nevertheless, appellant became upset if she wet herself, calling her "pissbug" and "shitbug" and spanking her. It was also testified that on at least one occasion he ordered Nickey to swear at her mother, directing her to

tell Marie "to kiss her ass," and although she was not capable of repeating that long a phrase he had spanked the child when she did not do as he had said. In addition, on one occasion during an argument with Marie he accused her of loving the baby more than she loved him. The jury returned a verdict of guilty, and Franklin was sentenced to life imprisonment. He appeals from the judgment and sentence and from the denial of his motion for new trial.

1) Franklin has not raised the general grounds but we have nevertheless reviewed the evidence in a light most favorable to the verdict and conclude that a rational trier of fact could reasonably have found appellant guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See *Payne v. State,* 249 Ga. 354 (1), 356 (291 SE2d 226) (1982).

2) Franklin's sole enumeration of error concerns the following dialogue during cross-examination of Melissa Nicey: Q. "[Y]ou don't have such a good feeling about Wayne Franklin, do you?" A. "He's all right." Q. "All right. After all, he did love that child, didn't he?" A. "Yes." Q. "And all in all he treated your sister good, didn't he?" A. "Yes." Q. "Have you ever seen your sister, Marie, whip the child?" A. "No." Q. "You never saw her put a finger on the child?" A. "I've seen her hit her on the hand when she put her hand on something when she ain't got nothing to put her hand on — spank her on the hand." Q. "Speak loud enough that the jury — " A. "I said I seen her hit her on the hand when she put her hand on something she ain't got no business putting her hand on." Q. "Did she hit her hard enough to leave a little sign?" A. "No." Q. "And you said Wayne's all right. I say you say that Wayne's all right?" A. "Uh-huh."

After this exchange the state sought and obtained a ruling that appellant's counsel had placed his client's character in issue, and subsequently the district attorney introduced certified copies of Franklin's prior convictions for sodomy and theft by taking. On appeal appellant contends he did not put his character in issue and that admission of the evidence of his prior convictions was harmful error.

At the start of our analysis we note that a witness' opinion of a party's character which is based solely upon the witness' personal observation of the party is not an approved mode of character evidence, *Waters v. State,* 248 Ga. 355 (5) (283 SE2d 238) (1981), and is subject to being struck, *Hudson v. State,* 163 Ga. App. 845 (4), at 845-846 (295 SE2d 123) (1982). Here, the final question and answer, if they can properly be characterized as the equivalent of character evidence, clearly focused on personal observation and were eligible for purging. However, the state did not object or move to strike, but instead elected to urge that the defense had opened the door to

evidence of his bad character. As to that contention, the rule is that it is possible for a criminal defendant to put his character in issue while cross-examining a state's witness, *McKenzie v. State,* 8 Ga. App. 124 (2) (68 SE 622) (1910); *Flannagan v. State,* 22 Ga. App. 620 (1) (97 SE 82) (1918), and if he does the state then has a right to rebut by introducing copies of convictions for crimes of moral turpitude to prove general bad character, *Ailstock v. State,* 159 Ga. App. 482 (3) (283 SE2d 698) (1981); *Giles v. State,* 71 Ga. App. 736 (c) (32 SE2d 111) (1944). However, in making a determination whether questioning during cross-examination has placed the defendant's character in issue, we must also take into account his right to a thorough and sifting cross-examination of adverse witnesses, which includes the right to explore possible bias and interest. For example, even if a witness denies she is biased against the defendant, defense counsel is not bound by that answer and may attempt to impeach the witness in that respect. *Sasser v. State,* 129 Ga. 541 (6) (59 SE 255) (1907); *Schamroth v. State,* 84 Ga. App. 580 (2) (66 SE2d 413) (1951).

In the instant case it seems clear that, standing alone, the final question of the quoted exchange would be an inquiry into character. Further, after viewing the exchange as a whole we find nothing in its thrust and tenor that leads us to a different inference. *Smith v. State,* 141 Ga. App. 64 (2) (232 SE2d 401) (1977). In this regard we think that both the number of questions and their subject matters are significant. Following his first question, which was obviously aimed at the witness' possible bias, counsel asked six other questions before the objected-to query, and presumably had time to carefully choose his wording. Moreover, two of those intervening six arguably touched on Franklin's character as a good family man, and the remaining four had nothing to do with Melissa's bias or interest. On balance we find as a matter of law that the thrust and tenor of the disputed questions and answers establish that appellant placed his character in issue, and it was not error to allow the state to introduce evidence of his bad character. Moreover, even if there was error it was nevertheless harmless, since the remaining evidence against Franklin was overwhelming and it is highly probable that admission of his prior convictions did not contribute to the judgment. *Johnson v. State,* 238 Ga. 59 (230 SE2d 869) (1976). See *Hamilton v. State,* 239 Ga. 72, 76 (235 SE2d 515) (1977); *Richards v. State,* 157 Ga. App. 601 (2) (278 SE2d 63) (1981).

*Judgment affirmed. All the Justices concur, except Hill, C. J., and Smith, J., who concur specially. Gregory, J., disqualified.*

DECIDED MAY 26, 1983.

*A. Frank Grimsley, Jr.,* for appellant.

*Gary C. Christy, District Attorney, Richard E. Thomas, Assistant District Attorney, Michael J. Bowers, Attorney General, Nicholas G. Dumich, Assistant Attorney General,* for appellee.

HILL, Chief Justice, concurring specially.

I write because I cannot agree with the conclusion of the majority in Division 2 that the defendant placed his character in issue. I concur in the judgment, however, because I do agree that although the trial court erred in allowing the state to introduce evidence of the defendant's bad character, the error was harmless because it is highly probable that it did not contribute to the judgment. *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869) (1976).

I am authorized to state that Justice Smith joins in this special concurrence.