## 40781. SPIVEY v. THE STATE.
### (319 SE2d 420)

WELTNER, Justice.

This is a death penalty case, here on direct appeal and for review pursuant to the Unified Appeal Procedure and OCGA § 17-10-35. Appellant, Ronald Spivey, was convicted in Muscogee Superior Court of the murder and armed robbery of Billy Watson, the kidnapping and armed robbery of Mary Davidson, and the aggravated assaults on Buddy Allen and Jeff Arrington. These crimes all occurred in December 1976 at a shopping mall in Columbus, Georgia, a few hours after Spivey had murdered a man in Macon, Georgia.

We first encountered this case six years ago when on direct appeal we affirmed Spivey's various convictions and death sentence. *Spivey v. State,* 241 Ga. 477 (246 SE2d 288) (1978). Spivey obtained federal habeas relief (Spivey v. Zant, 683 F2d 881 (5th Cir. 1982) and Spivey v. Zant, 661 F2d 464 (5th Cir. 1982)) which resulted in the return of the case to Muscogee Superior Court for retrial on the issues of guilt and sentence. The case was retried in November 1983, not quite seven years after the crimes were committed.

### Facts

The factual elements of the case are essentially undisputed.

Billy Watson, a Columbus police officer, was employed as a security guard at Brer Rabbit's, a restaurant in Peachtree Mall directly

across the hall from the Final Approach Lounge.

Shortly after 2:00 a.m. on December 28, 1976, Watson noticed that the door to the Final Approach was still open. He and Brer Rabbit's manager, Buddy Allen, decided to walk over and investigate, as they knew that the doorway should have been closed at 2:00 a.m. They entered the lounge, which was empty, and proceeded towards the bar, where they heard voices. As they approached the doorway to the bar, Ronald Spivey shot Watson twice, killing him. Spivey then shot Allen two or three times.

Spivey, who had just robbed two waitresses and a customer of approximately $400, herded his three hostages out of the Final Approach, taking Watson's gun as they left. When they reached the door, Allen groaned. Spivey turned and shot him again.

Spivey took his hostages outside the mall to the parking lot, demanding that someone furnish him a car. Meanwhile, Allen got up and proceeded to Brer Rabbit's in an effort to get help. Spivey followed him, and then fired several times into the restaurant. One bullet struck a bartender in the hip. Spivey then took the remaining hostage, Mary Davidson, to his car and they proceeded to Alabama, where he was arrested and she was released.

## Enumerations of Error

1. In his sixth enumeration of error, Spivey contends the evidence is insufficient to support the verdicts. We note that although he pleaded not guilty, his basic contention at trial was that he was guilty but mentally ill. The evidence amply supports a finding that Spivey committed the crimes charged, and a rational trier of fact could have found from the evidence presented that Spivey failed to establish mental illness, as defined by OCGA § 17-7-131 (a) (2). Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Brown v. State*, 250 Ga. 66 (2) (295 SE2d 727) (1982).

2. In his fifth enumeration, Spivey complains of the court's charge that if the jury believed "beyond a reasonable doubt under the evidence and the court's instructions that the defendant is guilty and was mentally ill at the time of the commission of the offense," then the jury would be authorized to find Spivey guilty but mentally ill. Spivey contends that, as it was he and not the state urging the jury to return a verdict of guilty but mentally ill, the charge as given was unconstitutionally burden-shifting. We disagree.

OCGA § 17-7-131 (c) (2) provides that a defendant may be found guilty but mentally ill if the jury "finds beyond a reasonable doubt that the defendant is guilty of the crime charged and was mentally ill or mentally retarded at the time of the commission of the crime." The court's charge was consistent with Georgia law. We note that the

standard of proof established by Georgia law is consistent with guilty but mentally ill provisions of other states, including Michigan, which first formulated such form of verdict in 1975. See People v. Booth, 324 NW2d 741, 744 (Mich. 1982); Mich. Stat. Ann. § 28.1059 (1). See also Ill. Rev. Stat. Ch. 38 § 115-3 (c).

A state may constitutionally require a criminal defendant to prove his insanity defense beyond a reasonable doubt. Rivera v. Delaware, 429 U. S. 877 (97 SC 226, 50 LE2d 160) (1976); Leland v. Oregon, 343 U. S. 790 (72 SC 1002, 96 LE 1302) (1952). In Georgia, proof of sanity is not an element of the prosecution's case and the defendant bears the burden of persuasion on that issue. *Brown v. State*, supra. It is equally clear that mental illness is not an element of the underlying offense. Instead, the guilty but mentally ill verdict allows for accommodation to the mental health needs of those defendants who are guilty, but have a mental disorder which falls short of insanity under OCGA § 16-3-2. The statutory provision that such mental illness be proved beyond a reasonable doubt is not constitutionally infirm. Patterson v. New York, 432 U. S. 197 (97 SC 2319, 53 LE2d 281) (1977).

3. In his first four enumerations of error, Spivey contends that for a variety of reasons, the district attorney's closing argument at the guilt phase of trial was improper, violating Georgia law as well as federal due process.

(a) It is clear from the transcript of the proceedings below that the disputed issue in the case was not whether Spivey was guilty or not guilty, but whether he was guilty, or guilty but mentally ill. The prosecutor was not required to accede to Spivey's contention that he was guilty but mentally ill, nor was he precluded from arguing vigorously his position that Spivey was guilty. The prosecutor was entitled to emphasize the evidence favorable to his contention, to discuss and draw inferences from factual matters in evidence relating to the credibility of witnesses, and to respond to points made in — and issues omitted from — the defendant's closing argument. *Conner v. State*, 251 Ga. 113 (6) (303 SE2d 266) (1983).

Spivey contends that the prosecutor misstated the law regarding the verdict of guilty but mentally ill.

During the district attorney's concluding argument the following transpired:

[The district attorney] "And let me make the position of the State of Georgia, whom I represent, clear in this case from this moment forward. And that is this. The verdict of guilty but mentally ill is the same as a not guilty verdict. On behalf of these victims —"

[Defense counsel] "Your Honor, that's a misstatement of the law and it misleads the jury. And I never interrupt during a closing argument, but, Your Honor, that is a misstatement of the law."

[The court] "The court will give the law."

[The district attorney] "Thank you."

[Defense counsel] "I apologize for interrupting, Your Honor, and I apologize to Mr. Smith."

[The district attorney] "In the eyes of these victims, members of the jury, I submit they are synonymous, one and the same. Of course, they're separate verdicts. Of course they are. You're going to be given four potential verdicts. And I submit to you in the eyes of the prosecution and the eyes of the victims, they're one and the same."

The jury was sworn to "render a verdict according to the law and the evidence. . . ." In response to the defense objection to the state's closing argument, the court instructed the jury that the court would give the law. The defendant did not move for a mistrial. We find no reversible error.

(b) Spivey makes further complaints about the prosecutor's guilt-phase argument.[1] However, as these complaints were not timely raised at trial, we do not address them except as noted in Division 4, infra. *Mincey v. State,* 251 Ga. 255 (14) (304 SE2d 882) (1983).

4. In his seventh enumeration, Spivey contends that the district attorney's closing argument at the sentencing phase, independently and in combination with his closing argument at the guilt phase, violated due process by encouraging the jury to impose the death penalty on the basis of arbitrary factors.

At trial, Spivey objected to two portions of the prosecutor's closing argument, both of which related to observations concerning the purposes of punishment. In the first instance, the prosecutor argued that the protection of the public, by the substitution of legal process for personal revenge and retaliation, was one of the legitimate purposes of criminal punishment, and that the purpose could be achieved only so long as the public had confidence and faith that the system worked.

Later, after discussing rehabilitation as a goal of punishment, the prosecutor stated that "[Spivey], as proved to you through our evidence and through his own witnesses' testimony over and over that either he cannot or he will not live under the rules of our society which allow you and me to live and work and raise our families and be free and safe from individuals like this."

We find nothing improper in either argument. *Conner v. State,* supra; *Horton v. State,* 249 Ga. 871 (295 SE2d 281) (1982). See also, *Gregg v. Georgia,* 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); *Williams v. New York,* 337 U. S. 241 (69 SC 1079, 93 LE 1337) (1949).

---

[1] For example, Spivey complains that the prosecutor compared his psychiatrist to a "snake-oil salesman." We note that in Spivey's closing argument, the state's psychiatrist was referred to as working in the "Milledgeville meat-market."

On appeal, Spivey for the first time complains of additional portions of the prosecutor's closing argument, which he contends involved such egregious misconduct as to deny him fundamental fairness, and thus due process.

We note, first, that it is generally true that "[a] party can not during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." *Joyner v. State*, 208 Ga. 435 (2) (67 SE2d 221) (1951). Objections to argument ordinarily cannot be raised for the first time after trial. *McAllister v. State*, 231 Ga. 368 (1) (202 SE2d 54) (1973); *Scott v. State*, 229 Ga. 541 (6) (192 SE2d 367) (1972). In a death penalty case, however, we must review the entire record to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." OCGA § 17-10-35 (c) (1). This includes review of closing arguments. *Gilreath v. State*, 247 Ga. 814 (15) (279 SE2d 650) (1981). It does not, however, require that we reverse a death penalty simply because some portion of the closing argument might have been subject to some objection never made. See *Mincey v. State*, supra, (17b). Instead, we determine only whether the argument, considered in its entirety, was so prejudicial or offensive, or involved such egregious misconduct on the part of the prosecutor as to require reversal of the death sentence on the basis that it was impermissibly influenced by passion, prejudice, or any other arbitrary factor. *Conner v. State*, supra, 251 Ga. at 123. We conclude that the argument in this case did not have that effect.

We have not overlooked the cases cited by appellant. See, Drake v. Francis, 727 F2d 990 (11th Cir. 1984); Tucker v. Zant, 724 F2d 882 (11th Cir. 1984); Tucker v. Francis, 723 F2d 1504 (11th Cir. 1984); Brooks v. Francis, 716 F2d 780 (11th Cir. 1983); and Hance v. Zant, 696 F2d 940 (11th Cir. 1983). We find that Drake v. Francis, supra, is not analogous. The prosecutor in this case did not read from *Eberhart v. State*, 47 Ga. 598 (1873), a practice of which we have disapproved on more than one occasion. See, e.g., *Hawes v. State*, 240 Ga. 327 (11) (240 SE2d 833) (1977). We have previously stated our disagreement with Hance v. Zant. *Conner v. State*, supra. The remaining cases are pending on rehearing *en banc* and therefore, under Rule 26 (i) of the rules of the Eleventh Circuit, stand vacated. In any event, we do not agree that bombastic or grandiloquent argument is unconstitutional.

5. In his ninth enumeration, Spivey contends that because he was already serving a life sentence for the murder he committed in Macon, the jury should have been instructed that if it imposed a life sentence in this case, it could specify whether the sentence was to run concurrently or consecutively to his previous life sentence. Spivey relies upon *Anglin v. State*, 244 Ga 1 (1) (257 SE2d 513) (1979) and *Wade v. State*, 231 Ga. 131 (200 SE2d 271) (1973). *Wade v. State* was

decided when Georgia law provided that: "[In felony cases tried by a jury,] [t]he jury . . . shall fix a sentence within the limits prescribed by law. The judge shall impose the sentence fixed by the jury . . . as provided by law." Ga. Laws 1973, pp. 159, 162. This court held that because, unless otherwise specified, multiple sentences were to be served concurrently (see former Harrison Code Ann. § 27-2510), and as Wade's jury did not specify that the three sentences fixed by it were to run consecutively, the trial court was required to impose concurrent sentences upon the defendant.

The law was subsequently changed to eliminate jury sentencing in all but death penalty cases. Ga. Laws 1974, pp. 352, 357. In *Anglin v. State*, supra, this court reviewed a double murder case in which the state had sought the death penalty for each of the two murders committed by Anglin, and the jury had unanimously recommended mercy. The trial court sentenced the defendant to two consecutive life sentences. Following *Wade*, we concluded that because the jury had not specified that the life sentences be served consecutively, the judge was by law required to impose concurrent life sentences. However, we subsequently refused to apply *Wade* and *Anglin* to a double murder case in which the state had not sought the death penalty. *Duckworth v. State*, 246 Ga. 631 (2) (272 SE2d 332) (1980). Still later we determined that neither *Wade* nor *Anglin* had any application to a case in which the state had sought unsuccessfully the death penalty for a defendant who had committed a murder in Bibb County and who was already serving a twenty-five year sentence for robbery in Florida. *Cobb v. State*, 250 Ga. 1 (1) (295 SE2d 319) (1982).

Under our present law, where the state seeks the death penalty and follows the procedure provided for in OCGA § 17-10-30, the jury may recommend the death penalty or it may recommend mercy. If it recommends death, "the court shall sentence the defendant to death." OCGA § 17-10-31. Otherwise, the court must sentence the defendant to imprisonment as provided by law. Ibid., OCGA § 17-10-2. While the jury may make a binding recommendation of life or death, it does not impose the sentence.

Our holding in *Wade* was made in the context of a sentencing procedure no longer in effect in Georgia. We find that regardless of the continuing validity of *Anglin*, it stands for no more than the proposition that where a prosecutor seeks the death penalty for two offenses and the jury unanimously recommends mercy for both, only the jury has the right to designate as consecutive the two life sentences imposed in that case. We hold that *Anglin* has no application to a case in which the state is seeking the death penalty for a defendant who has already been sentenced in a previous case. Thus, the trial court in this case did not err by refusing to instruct the jury that it could specify whether Spivey's sentence was to run concur-

rently or consecutively to his previous life sentence. This enumeration of error is meritless.

6. In enumerations 10 through 14, Spivey contends the voir dire was overly restricted; that potential jurors were erroneously excused under Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968); that certain jurors should have been excused for actual bias and were not; and that the answers given on voir dire, coupled with evidence of prejudicial pre-trial publicity, showed that a change of venue should have been granted.

(a) Spivey's request for individual, sequestered voir dire was granted. The voir dire examination of potential jurors took four days to complete and fills over 1200 pages of transcript. Seventy potential jurors were examined, of which 20 were excused, leaving a qualified panel of 50 from which the parties selected 12 jurors and two alternates.

From our examination of the voir dire transcript, we conclude that the voir dire was not overly restrictive. Jurors were thoroughly examined about their exposure to pre-trial publicity, their attitudes for and against the death penalty, and their knowledge of witnesses in the case. Both parties were allowed "an opportunity to ascertain the ability of the prospective jurors to decide the case on its merits, with objectivity and freedom from bias and prior inclination." *Waters v. State*, 248 Ga. 355, 363 (3) (283 SE2d 238) (1981). See also, *Henderson v. State*, 251 Ga. 398 (1) (306 SE2d 645) (1983).

The trial court did not err by refusing to allow Spivey to ask veniremen what kinds of magazines they read, what kinds of television programs they watched, what they would want to know before deciding on the death penalty, what went through their minds when they learned they might be serving on a death penalty case, or whether they thought life imprisonment would allow the possibility of parole. Ibid. Spivey's fourteenth enumeration of error is meritless.

(b) Spivey's thirteenth enumeration, in which he complains of the practice of death-qualification of potential jurors, is likewise without merit. *Mincey v. State*, supra.

(c) Fourteen veniremen expressed a conscientious opposition to the death penalty. (This number does not include jurors who expressed an ambivalence about the death penalty, or a reluctance to impose it.) Of these 14, six were excused for cause. Each of these six stated unambiguously and unequivocally that he or she would vote against the death penalty regardless of what evidence might be presented at trial. We note that Spivey attempted to rehabilitate these veniremen by asking whether or not they would consider the death penalty. We adhere to our previously stated position that: "It is not sufficient that the juror be willing to 'consider' the death penalty if he or she is committed to automatically vote against the death pen-

alty after having 'considered' it." *Cofield v. State*, 247 Ga. 98, 103 (2) (274 SE2d 530) (1981).

The Witherspoon questioning was not inadequate. On the contrary, both parties were allowed extensive examination on that issue. Furthermore, we find no merit to Spivey's suggestion that the trial court did not understand its obligations under Witherspoon. It is clear from the court's retention of many jurors with decidedly strong reservations concerning the death penalty that the court understood that only those jurors in total opposition to the death penalty were to be excused.

Spivey's twelfth enumeration of error is without merit.

(d) Spivey contends the trial court erred by failing to excuse for cause ten jurors. Of these ten, five were not challenged at trial and the trial court did not err by failing to excuse these jurors on the court's own motion.

One juror, Ms. Brown, was challenged by Spivey because she stated that her mother-in-law and her daughter were sick and that service upon the jury would be a hardship. She testified, however, that she had not formed an opinion as to appellant's guilt or innocence and that she had no prejudice or bias for or against him. The trial court did not commit reversible error by refusing to excuse her.

Two jurors, Ms. Day and Ms. Moseley, indicated in response to suggestive questions by defense counsel[2] that they were not sure that they could put out of their minds what they had read or heard about the case and be completely fair and impartial. Neither juror, however, had an opinion regarding Spivey's guilt or innocence, and, on further examination, each stated unequivocally that she could be fair and impartial, and could render a verdict based solely on the evidence presented. The trial court did not err by refusing to excuse these two jurors. *Wilson v. State*, 250 Ga. 630 (5) (300 SE2d 640) (1983).

The voir dire of Mr. Burrus presents the reverse of the Witherspoon question. He first stated that he would automatically vote for the death penalty if Spivey were found guilty. However, he subsequently stated that, while he would lean toward the death penalty, he would not automatically vote it. He stated: "I would listen to the testimony before making a decision. If the testimony is of a nature — is not sufficient to me, then I believe that the death penalty in that case

---

[2] For example, Ms. Moseley was asked: "And you are saying that because of that and what you have been exposed to that, and it's a part of you and you said, you know, you can't completely put it out of your mind, can't just wipe your mind blank — [A: Right] — that that might result in giving you some feelings about the case one way or the other against the state or for the state or the defendant or anything that those, the fact that it is in your mind and you can't put it out might leave you with some feelings in the case one way or the other; is that true?" The juror answered, "Right, that's true." See Murphy v. Florida, 421 U. S. 794, 801-802 (95 SC 2031, 44 LE2d 589) (1975).

is appropriate. But if the mitigating-aggravating testimony is of a nature that it causes me to wonder if the death penalty is appropriate, then certainly I'll consider a life sentence." The court did not err by refusing to excuse Mr. Burrus for cause. *Roberts v. State*, 252 Ga. 227 (10g) (314 SE2d 83) (1984).

The remaining juror, Spivey contends, was "the most egregiously biased."

Mr. Lynes had been employed at a shoe store at the Peachtree Mall for four years, and knew some of the security officers at the mall. He had heard about the case, both from media reports and from having talked to people about the case. However, he had not talked to a witness or to anyone who had investigated the case. Nor had he formed an opinion as to Spivey's guilt or innocence, or of appropriate punishment. He stated that he could put aside any knowledge he had of the case and render a verdict based solely upon the evidence.

Then Spivey's attorney informed Mr. Lynes: "[T]his is what we call a retrial in this case. The original offenses took place back in late 1976 and the first trial was conducted back in the spring of 1977 and now we are back to retry the case." Counsel asked, "How do you feel about that?" Mr. Lynes answered, "I really feel it is a waste, personally. . . . I believe that from all I have heard and read that it's just a waste of money to go any further with it, really. . . . I've heard the facts stack as high as the wall right there . . ."

However, in response to questions put to him by the district attorney and the court, the juror subsequently reaffirmed his belief that he could be fair and impartial and that he could render a verdict based upon the evidence.

Then Spivey's counsel propounded the following question: "You have told me two or three times that you think this is a waste of time and God knows I understand that a lot of people could come in here and say the same thing and other people have been excused for that and there is no crime in that, okay? Because the only crime, the only breach of a duty is if you are not 100% honest with us now because once you go past this point and you are put on the jury there is no turning back and you can't come back in a couple of days and say well, I do feel like I am prejudiced a little bit and you have told me two or three times that you think this is a waste of time. And whoever sits in this box is going to decide whether this man stays in jail for the remainder of his life or whether he is electrocuted. And I feel like you are trying to tell us that it's a waste of time and my question is, can you honestly say that you can take that feeling that this is a waste of time with all the evidence you know about and that you will totally and completely forget that and not let that be a part of you as you sit as a juror in this case."

Mr. Lynes answered, "That's correct."

Later Spivey's counsel asked a question of similar length as to whether Mr. Lynes might be prejudiced against Spivey. Mr. Lynes responded: "Well, I said it and I will say it again. I believe I can just go by the evidence that is given in the case to make the right decision at that time."

Still later, Mr. Lynes stated that he did not believe that vengeance should play any part in the decision to impose the death penalty and that he believed that anyone could be rehabilitated if he were worked with long enough. Then, in response to further defense inquiry on the subject of bias, Mr. Lynes stated that he did not think that he would have any difficulty being a fair and impartial juror; that he could refrain from forming any solid opinions and concrete decisions until he heard both sides of the case; and that he conscientiously could keep an open mind throughout the entire proceedings.

A juror is not disqualified if he can lay aside whatever opinions or impressions he may have had and decide the case based upon the evidence presented in court. *Waters v. State*, supra, 248 Ga. at 362. This juror stated repeatedly that he could do just that. Spivey argues, however, that in this case, the juror's answers were not dispositive and that he should have been excused despite his repeated assurances that he could be fair and impartial.

Spivey relies on language in United States Supreme Court cases indicating that a juror's assurances of his own impartiality cannot always be dispositive. For example, in Irvin v. Dowd, 366 U. S. 717 at 728 (81 SC 1639, 6 LE2d 751) (1961), the Court stated: "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but . . . [w]here so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." And in Murphy v. Florida, 421 U. S. 794, 802, (95 SC 2031, 44 LE2d 589) (1975), the Court stated that "indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory . . ."

These cases involved the question whether venue should have been changed as a result of massive pre-trial publicity. They do not directly involve the question of whether a single juror is qualified or disqualified based upon his answers. Nonetheless, they undoubtedly are relevant in the present context.

We do not find the circumstances of this case to indicate a general partiality on the part of the venire, for reasons stated in the next subdivision of this opinion. We therefore conclude that the trial court did not err by relying on the repeated assurances of Mr. Lynes that he could be a fair and impartial juror or by refusing to excuse the

juror.[3]

Spivey's tenth enumeration of error is meritless.

(e) In his eleventh enumeration, Spivey contends the trial court erred by denying his motion for change of venue.

Criminal cases generally must be tried in the county where the crime was committed. OCGA § 17-2-2. However, if an impartial jury cannot be obtained in that county, the trial court must transfer the case to another county. OCGA § 17-7-150 (a).[4]

"In *Street v. State*, 237 Ga. 307, 311 (227 SE2d 750) (1976), we concluded regarding motions for change of venue 'that under the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.' The second test involves review of the voir dire examination of potential jurors. [Cit.] . . . [T]he empanelling of fair

---

[3] Having found no error in the court's refusal to disqualify Mr. Lynes, we offer this parenthetical comment upon the general problems involved in Witherspoon questions. First, it should be noted that prospective jurors rarely come into court with precisely defined opinions relative to the death penalty. Instead, most carry with them contradictions arising from a deep-seated human need to avenge outrageous cruelty, a quasi-religious tendency toward forgiveness, and a sense of the worth of every human life. Few have been called upon to formulate and express their thoughts with any degree of clarity or precision. In reality, then, voir dire becomes an exercise in the *shaping* of opinions, more so than their expression. Again and again, the record in death cases will contain answers which are ambiguous, equivocal, and contradictory. That is *not* because the juror is attempting to dissimulate, but because he never before has been required to formulate and express, with solemnity and finality, a viewpoint on one of the most controversial issues in modern American culture. The fact that a juror may arrive at a posture which varies from his initial expressions should be understood as exactly what it is — a final distillation, after substantial questioning by contending counsel and often by the judge, of theretofore unarticulated, amorphous, and casual thoughts upon capital punishment.

Such is the case here. Additionally, Mr. Lynes' comment ("it's just a waste of money to go further with it") is capable of several interpretations, one of which might be a belief that, no matter what the evidence or the verdict, any death sentence would be frustrated by interminable review at state or federal level. Or, it could amount to the assessment that because *everybody* knew what happened, and none of the facts of what happened were in dispute (witness Spivey's insistence that he was guilty but mentally ill), the conduct of a trial to establish what everybody, including Spivey, already knew to be the fact raises a substantive question as to the legal system itself.

Nonetheless, as we have noted, the final product of Mr. Lynes' thought process, as aided by the voir dire questioning, works no disqualification.

[4] OCGA § 17-7-150 (b) also provides for a change of venue where a defendant moves for a change of venue and submits evidence that shows a "probability or danger of violence." Although appellant alleged in his original motion for change of venue that "there is a great risk to his life and limb being incarcerated or tried in Muscogee County," appellant made no attempt to prove that venue should have been changed for that reason. Instead, he filed a "Motion to Insure Courtroom Security and Care of Defendant." At the motion hearing pursuant to Rule II (B) of the Unified Appeal Procedure, appellant was assured by the court that adequate security would be provided, and in fact it was. Compare *Gunn v. State*, 245 Ga. 359 (2) (264 SE2d 862) (1980).

and impartial jurors, as demonstrated on voir dire, makes it particularly difficult to show that the setting of the trial was inherently prejudicial." *Kesler v. State*, 249 Ga. 462, 471-472 (291 SE2d 497) (1982).

In this case, 20 of the 70 jurors who underwent voir dire were excused. Six of the 20 were excused under Witherspoon. One was excused without objection because of her age. Another was excused by agreement of the parties because it was clear from the voir dire that she could not understand English well enough to comprehend the evidence to be presented. Only 12 jurors were excused because of bias, prejudice, or prior opinion, and not all of these were tainted by pre-trial publicity. For example, one juror was a deputy sheriff who worked at the jail where appellant was being held prior to trial. Another juror had talked to a juror from the original trial. Two others knew the victim Mary Davidson quite well. In fact, no more than six of the twelve can accurately be said to have been disqualified by reason of their exposure to pre-trial publicity.

Many of the jurors had heard nothing about the case, and a majority of the jurors remembered very little, if anything, about it. The low percentage of veniremen excused for prejudice resulting from pre-trial publicity is strong evidence of the absence of prejudicial community bias. *Waters v. State*, supra, 248 Ga. at 361.

In an attempt to demonstrate that the setting of the trial was inherently prejudicial, Spivey refers us to copies of newspaper articles and columns attached to his amended motion for change of venue. Many of these articles preceded this trial by several years. He complains particularly of three editorials critical of federal courts and of delays in our criminal justice system, which preceded the trial by two, three, and six months, respectively. We have examined all of these articles and do not find the kind of pervasive inundation of the community as would demonstrate that the setting of the trial was inherently prejudicial. Compare, Murphy v. Florida, supra; Irvin v. Dowd, supra. Thus, we find no error in the court's refusal to grant a change of venue.

7. Prior to this trial, Spivey successfully challenged the array of the 1977 grand jury which had returned the original indictment, contending that women were under-represented on the grand jury list at that time.

After he was re-indicted, he challenged the arrays of the new grand and traverse juries. At the hearing on these challenges, he attempted to prove that young people between the ages of 18 and 30 were under-represented on both lists, and that discrimination had occurred in the selection of grand jury foremen, as shown by the predominance of white male grand jury foremen over the years.

(a) In his fifteenth enumeration, Spivey contends the trial court erred by refusing to sustain his challenges to the arrays of the grand

and traverse juries. In particular, he contends that the court erred by ruling that his proffer of evidence in that regard was inadmissible because the witness who compiled the jury data was not an expert. He contends that the assistant he hired to perform the entirely elementary task of totalling the number of 18 to 30-year-olds and the number of those over 30, from data contained in the court's own records in the possession of the superior court clerk, did not need to be a statistician or other kind of jury expert; he needed only to be able to read and to perform simple arithmetic. Spivey is likely correct here.

However, regardless of the competency of the witness, the trial court did not commit reversible error. In order to prevail on a jury challenge, a defendant must show not only the want of substantial representation of some group, but also that the group is cognizable for purposes of a jury challenge. *Wilson v. State*, supra, 250 Ga. at 635 (3a). Spivey made no attempt to show that persons between the ages of 18 and 30 form such a cognizable group. See *Mincey v. State*, supra, 251 Ga. at 262 (7); Hernandez v. Texas, 347 U. S. 475, 478 (74 SC 667, 98 LE 866) (1954). Regarding those groups which are cognizable as a matter of law, i.e., blacks and women, Spivey failed to offer any evidence which would show that either of these groups was significantly under-represented on the grand and traverse jury lists in effect at the time.

(b) In Rose v. Mitchell, 443 U. S. 545, 551-552 (99 SC 2993, 61 LE2d 739) (1979), the United States Supreme Court assumed, without deciding, that "discrimination with regard to the selection of only the [grand jury] foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." Rose v. Mitchell dealt with the selection of grand jury foremen in Tennessee, where the foreman is selected by the judge from the general population and added as a thirteenth member to every grand jury for the next two years.

In contrast to the Tennessee selection system in which the selection of the grand jury foreman affects the composition of the grand jury itself, in Georgia, the foreman is selected from the membership of each grand jury. Moreover, although the foreman may be appointed by a superior court judge, the unvarying practice in Muscogee Superior Court was that each grand jury selected its own foreman, as provided by OCGA § 15-12-67.

In view of the differences in method of selection, term of office and duties of the grand jury foreman, the assumptions of Rose v. Mitchell, supra, are inapplicable. We hold that the under-representation over a period of years of one or more groups in the office of grand jury foreman in Muscogee County provides no ground for reversal of a conviction obtained by a properly constituted traverse jury. See United States v. Perez-Hernandez, 672 F2d 1380, 1388-1389 (11th Cir.

1982) (Morgan, J., concurring specially).

Spivey's seventeenth enumeration of error is meritless. *Moss v. State*, 250 Ga. 368 (3) (297 SE2d 459) (1982).

8. In his eighteenth enumeration of error, Spivey contends that the jury panels from which the trial jury was selected were imbalanced in that no jurors over the age of 65 were included in the first few panels while 25 to 35% of the last few panels were over 65. As a result, he contends, after he used most of his peremptory challenges on the first few panels, his few remaining challenges had to be exercised on panels "containing a far greater percentage of older people." That grave imbalance in the age of prospective jurors on particular panels, he says, denied him his constitutional right to a jury representing a reasonable cross-section of the community.

These contentions are without merit, for several reasons.

First, even if we assumed that a fairly representative jury list must be proportional to the age divisions within the community, it would not follow that each venire summoned for the trial of a case would have to have exactly that makeup. Still less would it be necessary that every panel in that venire be itself balanced. Random selection from the jury list will, of course, result in variations in the makeup of different venires, and, as well, between different panels in each venire. Spivey offered no evidence that the variation between the different panels in this case was the product of anything other than random selection.

Second, his contention that he was required to exercise his peremptory challenges on panels with a high percentage of persons over the age of 65 misstates the fact. One hundred veniremen were summoned for the trial. However, only seventy underwent voir dire. Of these seventy, only two were over the age of 65 and one of them was excused by the court. The other one was on an alternate jury list, and her presence did not affect the exercise of peremptory challenges during the selection of the 12 jurors who tried the case.

Spivey's eighteenth enumeration of error is meritless.

9. Two attorneys from the public defender's office were appointed to represent Spivey. However, at his request, his father retained Douglas Peters, an attorney practicing in Decatur, Georgia, to represent Spivey. The two appointed attorneys were informed that their further assistance would not be desired.

Subsequently, Spivey filed a motion requesting funds for additional assistance, including additional attorneys; a criminal investigator; members of the National Jury Project to assist with the selection of a jury and the challenge to venue; two experts to assist with the challenge to the practice of Witherspoon-qualification of potential jurors; and an expert to assist in a study to show that 18 to 30-year-olds are a cognizable class for purposes of challenges to the jury array.

The court denied these requests for expert assistance. In his sixteenth enumeration of error, Spivey contends the refusal to grant funds for the payment of psychiatric, sociological and other experts denied him his rights to due process, equal protection of the laws, and effective assistance of counsel. We disagree.

Two eminently qualified psychiatrists testified for Spivey at trial — one of whom stated himself to be the only Harvard-trained, board-certified forensic psychiatrist in Georgia. It is clear that Spivey was not denied psychiatric assistance.

Moreover, Spivey was assisted during jury selection by two individuals, at least one of whom was a member of the National Jury Project. Spivey was not denied expert assistance in the selection of the jury, or in his challenge to venue.

Regarding his requests for additional legal and investigative assistance, the state noted at the hearing on that request that Spivey's attorney was formerly an assistant district attorney in Georgia, that the case had been tried once already, that counsel had a copy of the transcript of the previous trial, and that Spivey's attorney had from the first day of July 1983 to the middle of November 1983 to prepare for trial.

In this case, evidence of guilt was overwhelming. The only issue was Spivey's mental state, on which issue Spivey was well assisted by experts. Therefore, pretermitting any question of Spivey's indigency, we find that the presentation of Spivey's case was not hampered by the absence of additional expert assistance. We conclude that Spivey was not denied due process, equal protection of the law, or effective assistance of counsel by the court's refusal to appoint additional counsel or to provide investigative assistance. Williams v. Martin, 618 F2d 1021 (4th Cir. 1980).

With regard to his remaining requests for assistance to develop his challenge to the death-qualification of jurors, and his contention that young people were under-represented on the Muscogee County jury arrays, we find no reversible error in the court's denial of public funds for such expert assistance. See Wilson v. State, supra, 250 Ga. at 634 (2c); Mincey v. State, supra, 251 Ga. at 257-259 (2).

10. At the guilt-innocence phase of trial, Spivey attempted to introduce in evidence certain medical records, including letters written years earlier by psychiatrists or psychologists containing opinions of his mental condition, and transcripts of testimony given by various witnesses at the first trial of the case (see OCGA § 24-7-8).

Properly certified medical records were admitted after diagnostic opinions and conclusions were deleted. See Kesler v. State, supra, 249 Ga. at 474 (11). Documents not properly authenticated were excluded. See OCGA § 24-7-1 et seq. The transcripts of prior testimony were excluded upon objection by the state that Spivey had not shown that

any of the witnesses were deceased, disqualified, or inaccessible for any cause. OCGA § 24-3-10. We find no error in the court's evidentiary rulings in this regard.

Relying on the broad scope of evidence admissible at the sentencing phase of trial (see *Blankenship v. State*, 251 Ga. 621 (308 SE2d 369) (1983); *Romine v. State*, 251 Ga. 208 (305 SE2d 93) (1983)), Spivey contends that if this material was inadmissible at the guilt-innocence phase of trial, it nonetheless should not have been excluded at the sentencing phase.

We find no error. It is true that the rules of evidence "may not be applied mechanistically" to exclude obviously reliable information from the jury at the sentencing phase of a death penalty case. Green v. Georgia, 442 U. S. 95, 97 (99 SC 2150, 60 LE2d 738) (1979). That is not to say, however, that the rules of evidence are then in suspension. More importantly, Spivey did not attempt to offer this evidence at the sentencing phase of the trial. His nineteenth enumeration of error is meritless.

11. Spivey's previous conviction was set aside by the United States District Court for the Middle District of Georgia (see Spivey v. Zant, 683 F2d 881, supra, and Spivey v. Zant, 661 F2d 464, supra), on the ground that Spivey was required to submit to a psychiatric examination while he was unrepresented by counsel. The state was ordered to avoid the use, upon retrial, of any statement made by Spivey during the tainted examination.

Upon remand, a new examination was ordered by the court, the results of which the state used to rebut Spivey's contention of mental illness. In order to avoid tainting the new examination by the old, the court ordered that: "[N]o individual who participated in the examination and evaluation of said Defendant under order of this Court at Central State Hospital during 1977 participate in this examination and evaluation, and that the individuals who do conduct this examination and evaluation not read, review, examine, or otherwise take into account any results, reports, notes, or any communication whatsoever from those who did conduct the examination and evaluation of said Defendant as ordered by this Court at Central State Hospital during 1977. . . ."

Prior to the testimony of Dr. Jacobs, who conducted the 1983 court-ordered examination at Central State, Spivey insisted that the court's order had been violated. An evidentiary hearing was conducted outside the presence of the jury.

Spivey alleged that five persons who had participated in the 1977 evaluation took part in the 1983 evaluation. They were Dr. Smith, Gerald Archer, Robert Williams, Dr. Edward Clayton, and Dr. Rodrigo Bonfante.

At the hearing, it was shown that the Dr. Smith referred to in the

1983 examination was Dr. W. T. Smith, whereas Dr. Carl Smith had participated in the previous examination. It was shown that Gerald Archer had merely signed a pre-admission note reciting that a 43-year-old white male was brought to Central State by the sheriff of Muscogee County where he was charged with murder, armed robbery and aggravated assault, that he appeared to be in good physical and mental condition and that he was given some information booklets about the hospital and a patient's rights and responsibilities. Robert Williams had on two occasions furnished medicine to Spivey and had made a record entry reflecting that on one occasion Spivey received a $20 money-order and $10 in cash from a visitor and that Spivey kept the cash and put the money-order in the bank. Dr. Clayton conducted chest and skull x-rays. Dr. Bonfante performed an electro-encephalogram examination.

Dr. Jacobs testified that no records of the 1977 examination were brought to his building or referred to by him.

The court found no substantive violation of the spirit of its order, and we agree. It is clear that Archer and Williams conducted no evaluation of Spivey, and the tests conducted by Dr. Clayton and Dr. Bonfante were physical, not psychological. In any event, no statement made by Spivey during or as a result of the 1977 examination was used in his 1983 examination and evaluation.

We find no merit to the twentieth enumeration of error.

12. In his twenty-first enumeration, Spivey contends that the presence of eight uniformed guards forming a "tight semicircle" around him violated his right to a fair trial, and that the court erred by surrendering completely its discretionary control over the proceedings to the sheriff, citing United States v. Samuel, 431 F2d 610 (4th Cir. 1970).

"Although a defendant is entitled to trial free of the partiality which the presence of an excessive number of guards may create, special circumstances may make the presence of a number of guards necessary." Zant v. Gaddis, 247 Ga. 717, 718 (2) (279 SE2d 219) (1981).

At the trial of this case, Spivey was already convicted of a separate murder in Bibb County, Georgia, a fact related to this jury by Spivey himself. His defense was that he was mentally ill. Moreover, the issue of courtroom security was raised in the first instance by Spivey who requested prior to trial that the court take steps to insure his safety. See fn. 4. Obviously, courtroom security was essential.

The record shows that the officers did not form a semicircle around Spivey. There were officers present in the courtroom, and their number varied. Spivey has failed to show that their number was excessive or that their presence was "ominous" beyond what is inherent in the very presence of men armed with deadly weapons.

Nor do we agree that the court abdicated its responsibility by

surrendering control over the proceedings to the sheriff.

In response to Spivey's initial objection to the presence of the uniformed officers, the court stated: "Because of your concerns, I have ordered these people to be here so that we can — there can be no question that he is safe . . . I think I would not be doing my duty if I did not see that there was ample security. . . . [These officers are] not forming a semicircle around him . . . we're not going to be forming any semicircle around him. We're just going to have officers in this courtroom."

This ruling provides no support for Spivey's contention that the court had abdicated its discretion to the sheriff, *Green v. State*, 246 Ga. 598 (6) (272 SE2d 475) (1980) — if indeed such an event is ground for relief.

Spivey, however, points to a ruling made the next day. He had received permission to rise when a prospective juror entered or left the courtroom during the sequestered voir dire. On the second day of voir dire, Spivey objected that the officers rose everytime he rose. The court stated that it had "given [the responsibility of securing the courtroom] to the sheriff's office and it is their duty to do whatever they feel is necessary to make it secure."

However, when Spivey renewed his objection later, the court observed that, considering "all the . . . circumstances of this case I think it is justified in the officers' actions in rising when they do."

It is too much to expect that extemporaneous remarks by trial courts be made with the same precision expectable in written opinions. While some of the remarks of the trial court might suggest a delegation of security concerns to the sheriff it is apparent, *in toto*, "that while the sheriff was charged with the security of the courtroom, the trial court continued to oversee the sheriff's security measures." *Green v. State*, supra at 600.

Further, if Spivey objected to the officers rising with him, he could have remained seated.

This enumeration is without merit.

13. We find no merit to Spivey's twenty-second enumeration, in which he contends that this state has administered the death penalty law in an arbitrary and discriminatory manner.

14. The twenty-fourth enumeration contends that certain evidentiary rulings deprived Spivey of his right to due process and confrontation of the witnesses against him. We have reviewed the instances cited and find no ruling liable to the constitutional attacks here made.

15. In the twenty-fifth enumeration of error, we are asked to review the arrest, search and seizure, and the use of Spivey's statements, pursuant to Rule IV (b) (2) of the Unified Appeal Procedure. See *Rivers v. State*, 250 Ga. 303 (7) (298 SE2d 1) (1982).

(a) Spivey's motion to suppress was heard prior to trial. Based

upon the evidence presented, it was properly denied. *Durden v. State*, 250 Ga. 325 (1) (297 SE2d 237) (1982); New York v. Belton, 453 U. S. 454 (101 SC 2860, 69 LE2d 768) (1981).

(b) At trial, Spivey claimed that he could not recall any of the events of the shooting in Macon or the later shooting in Columbus. Moreover, he stated on direct examination that his memory lapse preceded the Bibb County trial of September 1977.

The state presented the testimony of five witnesses which indicated that at least shortly after the arrest and as late as the spring of 1977, Spivey recalled what had happened.

Ronald Lynn of the Columbus police department went to Wedowee, Alabama, where Spivey was being held, the morning of December 28, 1976. Officer Lynn explained to him his Miranda rights, obtained a waiver of those rights, and then explained extradition procedures. When Spivey was asked if he would waive extradition, he stated, "I'm not crazy. I'm not getting in the car and starting back to Columbus with you people . . . [T]hings [are] too fresh on people's minds over there."

Later that same morning, William Traylor of the Alabama Bureau of Investigation went to Wedowee to question Spivey about the events that had occurred in Alabama. Once again given his Miranda warnings, Spivey agreed to talk to Traylor. He stated that Ms. Davidson had helped direct him out of Columbus by some back roads. He said they had come to a small town, got a room at a motel, stayed there a couple of hours, and left, after having sex. Spivey stated that he had backed the car up to some bushes to hide his license plate. When they left, he saw a car following him that he thought was the police.

While Traylor was there, Spivey made two calls; one to his father, and the other to Sheriff Wilkes of Bibb County. Traylor testified that Spivey called Sheriff Wilkes because he did not want to be taken back to Columbus by Columbus officers. Spivey agreed to waive extradition and be transported to Macon in the custody of Macon law officers.

Charles Bishop of the Macon police department arrived at Wedowee with two other officers. He again advised Spivey of his Miranda rights, and again he waived them. As he was being transported to Macon, they drove through Columbus. Spivey pointed to Peachtree Mall and said, "It happened over there."

R. A. Jones of the Columbus police department went to Macon on December 29 to transport Spivey to Columbus. He also advised him of his Miranda rights. On the trip back, Spivey admitted that he knew what he had done and that he "felt really bad" about it. Later, he again pointed out the Peachtree Mall as the place "where it all happened."

Lee Johnson, a jailer at the Muscogee County jail, overheard Spivey, in the spring of 1977, admit to another prisoner that he had killed a police officer.

In Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), the United States Supreme Court held that a defendant is entitled to a fair hearing and a reliable determination on the issue of the voluntariness of statements made by him. In Sims v. Georgia, 385 U. S. 538, 544 (87 SC 639, 17 LE2d 593) (1967), the Court stated: "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." See Cofield v. State, 247 Ga. 98 (4) (274 SE2d 530) (1981).

The court failed to make such a specific finding as to the statement made to Ronald Lynn. Instead, the court simply stated, in response to appellant's objection, that the court would allow it to be presented to the jury.

The failure of the court specifically to rule on voluntariness at that time was, we believe, an oversight, as on each occasion thereafter, and with regard to all of the other four witnesses, the court's conclusion of voluntariness appears with "unmistakable clarity." In Cofield v. State, supra, we remanded the case to the trial court to conduct another Jackson-Denno hearing and to make an appropriate ruling. We need not do that here however. Regardless of any error respecting Officer Lynn's testimony, the substance of that statement was reiterated in Officer Traylor's testimony. The failure to rule explicitly on Officer Lynn's testimony regarding Spivey's statement was thus harmless beyond a reasonable doubt. Harrell v. State, 249 Ga. 48 (3) (288 SE2d 192) (1982).

16. In his eighth enumeration, Spivey contends that it was error to allow in evidence his admission that he had sex with Ms. Davidson at the motel. We disagree.

The testimony was logically connected to the crimes committed in Columbus, involving a continuous course of conduct, and involving one of the Columbus victims. It was properly offered in rebuttal to Spivey's testimony that he could not recall anything that happened from the time he left Macon until he woke up in the Wedowee jail. Horton v. State, supra, 249 Ga. at 878-879 (11); Putman v. State, 251 Ga. 605 (2) (308 SE2d 145) (1983).

17. Spivey also complains in his eighth enumeration of the introduction in evidence of "numerous gruesome photographs" of the crime scene. We find no error. Felker v. State, 252 Ga. 351 (10) (314 SE2d 621) (1984).

Nor do we find any other addressable error, not enumerated and argued by Spivey.

## Sentence Review

18. The jury found as a statutory aggravating circumstance that the "offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit: armed robbery." OCGA § 17-10-30 (b) (2). The evidence supports this finding. OCGA § 17-10-35 (c) (2).

19. Upon review of the record, including those matters discussed in Divisions 3, 4, 6, 16 and 17, we conclude that the sentence of death was not imposed under the influence of passion, prejudice or other arbitrary factors. OCGA § 17-10-35 (c) (1).

20. Spivey contends in his twenty-third enumeration of error that the sentence of death in this case is excessive and disproportionate to sentences imposed in similar cases. That, of course, is a matter which we are required to address in any event. OCGA § 17-10-35 (c) (3).

We have reviewed the cases cited by Spivey, and all other murder cases appealed to this court since January 1, 1970. OCGA § 17-10-37 (a); *Horton v. State*, supra, 249 Ga. at 880-881. The cases cited by Spivey do not involve murders perpetrated during an armed robbery of victims unknown to the defendant. Spivey contends, however, that they illustrate that the imposition of a death sentence upon a defendant who is severely mentally ill is "utterly at odds" with usual practice, and that the death sentence in this case is therefore disproportionate.

We note that the evidence in this case overwhelmingly shows that Spivey knew the difference between right and wrong, that he was not suffering from a delusional compulsion, that he was not incapacitated, nor was he unable to form the requisite criminal intent. OCGA §§ 16-3-2, 16-3-3; *Waters v. State*, supra, 248 Ga. at 370 (18). Moreover, the evidence demonstrates that Spivey's alleged "mental illness" was manifested primarily by "repeated unlawful and antisocial conduct." OCGA § 17-7-131 (a) (2).

Spivey was convicted of forgery in 1961; robbery by force in 1963; robbery by use of an offensive weapon, motor vehicle theft, and escape in 1965; armed robbery of a bank in 1967 (in federal court); and murder in 1977 (in Bibb County). The jury in this case had before it evidence of this serious prior record, as well as evidence which showed that in this case Spivey committed an armed robbery during the course of which he killed one person, seriously wounded another, shot another, and kidnapped still another.

We have noted that "juries find the death penalty to be appropriate punishment where an adult defendant commits murder during an armed robbery." *Mincey v. State*, supra, 251 Ga. at 274. The circumstances of this case as well as the serious prior record demonstrate that the death penalty in this case is not "excessive or disproportion-

ate to the penalty imposed in similar cases, considering both the crime and the defendant." OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 2, 1984 — REHEARING DENIED JULY 30, 1984.

*H. Haywood Turner III, Ronald J. Tabak*, for appellant.

*William J. Smith, District Attorney, Douglas C. Pullen, Assistant District Attorney, Michael J. Bowers, Attorney General, Dennis R. Dunn*, for appellee.

APPENDIX.

*Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Castell* v. *State*, 250 Ga. 776 (301 SE2d 234) (1983); *Horton v. State*, 249 Ga. 871 (295 SE2d 281) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Tucker v. State*, 245 Ga. 68 (263 SE2d 109) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Davis v. State*, 241 Ga. 376 (247 SE2d 45) (1978); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State*, 237 Ga. 852 (230 SE2d 287) (1976); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State*, 236 Ga. 697 (224 SE2d 910) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Mason v. State*, 236 Ga. 46 (222 SE2d 339) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975).