### 76492. MITCHELL v. THE STATE.
(369 SE2d 487)

DEEN, Presiding Judge.

The appellant, Ed Hill Mitchell, was indicted and tried for aggravated assault with intent to murder his mother, two counts of aggravated assault upon his mother with a deadly weapon, and making terroristic threats to his sister, all charges stemming from an incident that took place on November 30, 1986. Mitchell entered a special plea of insanity. The jury found him guilty but mentally ill of aggravated assault with intent to murder, one count of aggravated assault, and making terroristic threats, and this appeal followed.

Mitchell lived with his mother and sister in a duplex. He had an extended history of mental illness and substance abuse. According to Mitchell's sister, he had been in and out of mental institutions as an adult. Diagnosed as a paranoid schizophrenic, he had been hospitalized at the Georgia Mental Health Institute for much of the time from August 1985 until July 1986. In October 1986, Mitchell was picked up for involuntary psychological evaluation, after he told his sister that she was fixing to die because an angel told him to beat her brains out with a baseball bat. Mitchell's sister also recounted that he would never take his medication for his schizophrenia, but would continually get "high" sniffing glue, or paint, or even bug spray.

The incident of November 30, 1986, apparently was precipitated

by Mitchell's mother's insistence that his dog stay outside. Mitchell became upset, cursed his sister, and then remarked, "I will stab everything in the house. I will kill everything in the house." He then picked up a lamp and approached his sister, but desisted momentarily when his mother interceded. However, he quickly became angry again, picked up the lamp, and began beating his mother over the head. Mitchell's sister ran out of the house to get help. Paul Jackson, who lived in the other half of the duplex, heard screaming and knocked on the Mitchells' door; Mitchell came to the door, holding a can opener in his bloody hand, and told him, "If you come in, I will kill you." Jackson then went back to his apartment and called the police.

Shortly thereafter, a police officer arrived and secured Mitchell in his patrol car. After rendering aid to Mitchell's mother, the officer returned to his patrol car, at which point Mitchell uttered that he "should have killed the whole fucking house because they were evil," and that he would not do time for what he had done.

At the station he made the following statement. "On November 30, 1986, at approximately, sometimes this morning, I am not sure what time. This morning I was coming home and my little dog, Bandit, was outside and I wanted him to come in because of the weather. My mother and my sister, Lady, reject that and I got upset. I took the lamp and beat my mother in the face until I could beat her no more. Then I took the skillet off the stove and hit her in the head with it. I called the police and they came and got me. I told the officer that I was the one and that I had almost committed a murder."

The following question and answer session was also recorded: "Q: Do you care what happened to your mother? A: No, I don't. I don't care bout my mother and I don't care anything about blackness period. I would put them in hell today if I had the power because they ain't nothing but unclean, filthy, nasty, sissy bitches. Q: What would you do if you got out of jail? A: I would kill nothing but black people just like the man that killed all the little kids, what's his name? Wayne Williams? Q: Do you go to mental health facilities? A: Yes, I ain't been taking my medicine lately. I got out on Scott Boulevard every two weeks but I haven't been lately and I have tried to commit suicide three times but God just will not let me pass. I have asked God to show me my life and the purpose of my life but he will not. I gave my life to mental health in 1972, when I realized that I had a problem. Q: Have you been treated fairly by the police today? A: The white police have, but that black police said that if he could, he would blow my brains out. Q: Is there anything else that you want to add to your statement? A: I can't be happy because I love a white man and a white woman. That's all."

A psychiatrist, court-appointed to determine whether Mitchell

was competent to stand trial and whether he was responsible for his behavior at the time of the incident, interviewed Mitchell twice before the trial. Other than when Mitchell claimed that he and the jail had formed a conspiracy to trap God in one of the jail cells, the psychiatrist generally found Mitchell to be in contact with reality. During the interviews, Mitchell had explained that he had beaten his mother because the Devil had instructed him to stop her from putting his dog out, else she might hurt the dog. The psychiatrist concluded that, although Mitchell was delusional at the time of the incident, he had not acted out of compulsion, because a compulsion required a perceived situation that if one failed to act, something catastrophic would happen. He also concluded that Mitchell probably knew the difference between right and wrong. The staff psychiatrist who had treated Mitchell during his hospitalization at Georgia Mental Health Institute also testified that Mitchell knew right from wrong, that he comprehended the necessity of continuing to take his medication for schizophrenia, and that Mitchell was capable of choosing to take those medications. *Held*:

1. Mitchell contends that the verdict of guilty but mentally ill cannot stand, because the evidence showed that at the time of the incident he was unable to distinguish right from wrong and was acting under a delusional compulsion. Under OCGA § 16-3-2, a person is not guilty of a crime if he lacked the mental capacity to distinguish between right and wrong at the time of the incident in question; under OCGA § 16-3-3, a person is not guilty of a crime if, because of a mental illness, he acted under a delusional compulsion which overmastered his will to resist committing the crime. The only evidence concerning Mitchell's capacity to distinguish between right and wrong was the psychiatric opinion that he retained that capacity despite that mental illness. Concerning the issue of delusional compulsion, the uncontroverted evidence was that while Mitchell was delusional, he had not acted under a compulsion. Given this evidentiary posture, we concluded that "after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the crime." *Brown v. State*, 250 Ga. 66, 71-72 (295 SE2d 727) (1982).

Mitchell also contends that his conviction for making terroristic threats cannot stand because it was based upon "the uncorroborated testimony of the party to whom the threat is communicated." OCGA § 16-11-37. Only slight circumstances are needed to corroborate a victim's testimony, for purposes of OCGA § 16-11-37. *Ellis v. State*, 176 Ga. App. 384 (3) (336 SE2d 281) (1985). In the instant case, the terroristic threat consisted of Mitchell's declaration to his sister that he would kill everything in the house, followed by his picking up a lamp

and approaching his sister. The necessary corroboration of the occurrence of the terroristic threat was provided by (1) the victim's recounting Mitchell's previous threat against her which resulted in a brief involuntary hospitalization for psychological evaluation, (2) the fact that moments later Mitchell did use the lamp in a vicious assault upon his mother who had interceded on behalf of the sister, and (3) the arresting officer's testimony that Mitchell had uttered to him in the patrol car that he should have killed everyone in the house.

2. Under OCGA § 16-3-3, a defendant may not be guilty of a criminal act where he acted under a delusional compulsion, but the delusion must be as to a fact which, if true, would have justified the act. *Stevens v. State*, 256 Ga. 440 (350 SE2d 21) (1986). In charging the jury on delusional compulsion as a defense, the trial court further instructed the jury on when a person is justified in using force against another person, tracking the language of OCGA § 16-3-21 (a) concerning use of force in defense of self or others. Mitchell contends that by so charging the jury, the trial court as a practical matter told the jury that keeping the dog from being put outside did not justify his attacking his mother. The trial court simply stated the correct law on justification; it was the jury that decided protection of the dog constituted no legal justification for Mitchell's assault on his mother.

Mitchell also contends that the jury instruction was incomplete, as it did not inform the jury that justification may also exist "[i]n all other instances which stand upon the same footing of reason and justice as those enumerated in this article." OCGA § 16-3-20 (b). However, ensuring that one's dog gets to stay inside a house hardly stands upon the "same footing of reason and justice" as defending oneself or another against the imminent use of unlawful force by a third party, or any other situation enumerated in OCGA § 16-3-20 et seq.

3. Mitchell contends that the trial court erred in giving incomplete jury instructions on voluntary and involuntary intoxication. The trial court defined involuntary intoxication only to aid the jury's understanding of voluntary intoxication. The trial court did not instruct the jury on the legal excuse that involuntary intoxication may furnish under OCGA § 16-3-4 (a), and such an instruction would have been inappropriate in the instant case. The only intoxication shown in this case was Mitchell's chronic drug abuse, which, like chronic alcoholism, is not involuntary under the law. *McLaughlin v. State*, 236 Ga. 577 (4) (224 SE2d 412) (1976).

Concerning voluntary intoxication, the trial court did charge the jury in accordance with OCGA § 16-3-4 (c) that voluntary intoxication is not an excuse for any criminal act, but omitted any instruction that if intoxication rendered Mitchell incapable of forming the requisite intent, Mitchell would not be criminally responsible. However, this court has previously held that it is not error to refuse to charge

that voluntary intoxication can negate the specific intent for a crime. *Williams v. State*, 180 Ga. App. 854 (2) (350 SE2d 837) (1986); *Faircloth v. State*, 175 Ga. App. 130 (332 SE2d 686) (1985).

The first Chief Justice of our Georgia Supreme Court, Joseph Henry Lumpkin, has observed in areas such as this: "[R]esponsibility depends upon the possession of will — not the power over it. Nor does the most desperate drunkard lose the power to control his will, but he loses the desire to control it. No matter how deep his degradation, the drunkard uses his will whenever he takes his cup. It is for the pleasure of the relief of the draught, that he takes it." *Choice v. State*, 31 Ga. 424, 473 (1860). As to related issues of voluntary imbibing of intoxicants, whether a product of the will versus whether it is a disease, see *Burger v. State*, 118 Ga. App. 328 (163 SE2d 333) (1968), and *Grimes v. Burch*, 223 Ga. 856 (159 SE2d 69) (1968). (When indulging in the Pierian Spring, however, it is noted that a different rule obtains: "[H]e drank deep of the Pierian Spring where shallow draughts intoxicate the brain and deep drinking sobers one again." In Memoriam to Judge Spencer R. Atkinson, 150 Ga. 835, 857.)

4. Mitchell asserts that the trial court improperly entered judgment and sentence for both aggravated assault with intent to murder and aggravated assault with a deadly weapon, on the basis that under the facts of this case the two offenses merged. We are compelled to agree. Both charges referred to Mitchell's assault on his mother, and the evidence actually showed only one attack upon his mother, i.e., when Mitchell beat his mother with a lamp. Since the facts adduced to prove the offense of aggravated assault with intent to murder were the same facts used to prove the offense of aggravated assault with a deadly weapon, as a matter of fact the latter must be considered an offense included in the former. OCGA § 16-1-7 (a); *Luke v. State*, 171 Ga. App. 201 (2) (318 SE2d 833) (1984).

5. The trial court decided against charging the jury on simple battery constituting a lesser included offense of the alleged offense of aggravated assault with intent to murder. Because no written request for such a jury instruction was made, it was not error for the trial court not to give it. *State v. Stonaker*, 236 Ga. 1 (222 SE2d 354) (1976). Moreover, because the indictment did not allege any physical contact or harm, a charge on simple battery would have been inappropriate, notwithstanding the fact that a battery actually occurred. *Tuggle v. State*, 145 Ga. App. 603 (244 SE2d 131) (1978); *Anderson v. State*, 170 Ga. App. 634 (317 SE2d 877) (1984).

6. The trial court instructed the jury on insanity, mental illness, and voluntary intoxication. In doing so, the trial court also charged that a person who suffers periodic delusional states may not intentionally and voluntarily induce his delusions or mental disorder and then be excused for a criminal act committed during such delusional

episode. Subsequently, the jury requested clarification on whether the failure to take medication, which could control a delusional state of mind or maintain the capacity to distinguish right from wrong, relates to the evaluation of that person's sanity. The trial court, however, declined to answer the inquiry, considering it one of the matters to be deliberated by the jury. While Mitchell correctly points out that "[w]hen the jury is confused and in doubt and requests further instructions on a particular point, it is the duty of the court to further instruct them." *Freeman v. State*, 142 Ga. App. 293, 294 (235 SE2d 560) (1977), we agree with the trial court that answering the particular inquiry in this case would have stepped over into the province of the jury.

7. The trial court instructed the jury that if it believed beyond a reasonable doubt that Mitchell was guilty and if it also believed by a preponderance of the evidence that he was mentally ill at the time of the offense, then it would be authorized to find him guilty but mentally ill. Mitchell contends that this jury charge was erroneous because under OCGA § 17-7-131 (c) the jury must find mental illness beyond a reasonable doubt, and because the charge subverts the *mens rea* requirement of criminal law.

In *Spivey v. State*, 253 Ga. 187, 189 (2) (319 SE2d 420) (1984), the Supreme Court held that "[t]he statutory provision [of OCGA § 17-7-131 (c) (2)] that such mental illness be proved beyond a reasonable doubt is not constitutionally infirm. [Cit.]" Subsequently, however, in addressing another constitutional attack on the same statute, the Supreme Court explained that "[t]he law places no burden on a defendant to prove that he is not mentally ill, or that he is guilty but mentally ill. The burden is on the state to prove that the defendant is guilty of the crime charged, including the requisite element of intent, beyond a reasonable doubt. The burden is on the defendant to prove he is not guilty by reason of insanity by a preponderance of the evidence. . . ." *Keener v. State*, 254 Ga. 699, 702 (334 SE2d 175) (1985). *Keener* seemingly would indicate that the trial court's jury instruction in the instant case was a correct statement of law, while *Spivey* seemingly indicates the opposite.

In any event, even if the proper standard for establishing the element of mental illness under OCGA § 17-7-131 (c) (2) is that of "beyond a reasonable doubt," the trial court's instruction in this case could not have harmed the appellant. *Dimauro v. State*, 185 Ga. App. 524 (364 SE2d 900) (1988). This "guilty but mentally ill" statute also does not subvert any *mens rea* requirement. Id.

8. The trial court informed the jury that it could find Mitchell not guilty, not guilty by reason of insanity, guilty but mentally ill, or guilty. In all cases in which the insanity defense is asserted, the trier of fact must find one of the above alternative verdicts under OCGA §

17-7-131 (b) (1). Under OCGA § 17-7-131 (c) (2), if a jury finds a defendant guilty but mentally ill, it must indicate that finding in its verdict. Such a verdict of guilty but mentally ill does not conflict with the requirement of a general verdict as provided by OCGA § 17-9-2.

9. We reject Mitchell's argument that informing a jury that it could return a verdict of guilty but mentally ill in effect deprives a defendant of the defense of insanity, on the basis that alternative affords the jury a "palatable verdict" of simultaneously holding a defendant responsible for his actions by finding him guilty, yet mitigating that finding by also finding him mentally ill. The jury was clearly informed of its task of determining the validity of the defendant's defense of insanity, and of the requirement to find the defendant not guilty by reason of insanity should it accept that defense. We will not assume that informing a jury of the possibility of returning a "guilty but mentally ill" verdict would cause the jury to ignore or avoid that task. Cf. *Dimauro v. State*, supra.

*Judgment affirmed as to the convictions for aggravated assault with intent to kill and making terroristic threats; judgment reversed as to the conviction for aggravated assault with a deadly weapon. Sognier, J., concurs. Carley, J., concurs in Divisions 1, 2, 3, 4, 5, 6, 8, 9 and in judgment.*

DECIDED APRIL 19, 1988 —
REHEARING DENIED MAY 3, 1988 —

Carl Greenberg, J. M. Raffauf, for appellant.
Robert E. Wilson, District Attorney, Thomas S. Clegg, Nelly F. Withers, Assistant District Attorneys, for appellee.